## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| WILLIAM ALLEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 7520-VCL |
| | ) | |
| EL PASO PIPELINE GP COMPANY, L.L.C., | ) | |
| RONALD L. KUEHN, JR., JAMES C. YARDLEY, | ) | |
| JOHN R. SULT, DOUGLAS L. FOSHEE, D. MARK | ) | |
| LELAND, ARTHUR C. REICHSTETTER, | ) | |
| WILLIAM A. SMITH, and EL PASO PIPELINE | ) | |
| PARTNERS, L.P., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| EL PASO PIPELINE PARTNERS, L.P., | ) | |
| | ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: March 28, 2014
Date Decided: June 20, 2014

Jessica Zeldin, ROSENTHAL, MONHAIT & GODDESS, P.A., Wilmington, Delaware; Samuel H. Rudman, Mark S. Reich, Michael G. Capeci, ROBBINS GELLER RUDMAN & DOWD LLP, Melville, New York; Randall J. Baron, ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California; Ethan D. Wohl, WOHL & FRUCHTER LLP, New York, New York; *Attorneys for the Named Plaintiff and the Class*.

Peter J. Walsh, Jr., Brian C. Ralston, Berton W. Ashman, Jr., Gerard M. Clodomir, Matthew R. Dreyfuss, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; *Attorneys for Defendants El Paso Pipeline GP Company, L.L.C. Douglas L. Foshee, Ronald L. Kuehn, Jr., D. Mark Leland, Arthur C. Reichstetter, William A. Smith, John R. Sult, and James C. Yardley*.

Lewis H. Lazarus, Thomas E. Hanson, Jr., MORRIS JAMES LLP, Wilmington, Delaware; *Attorneys for Defendant and Nominal Defendant El Paso Pipeline Partners, L.P.*

**LASTER, Vice Chancellor.**

On March 4, 2011, El Paso Pipeline Partners, L.P. (the "Partnership" or "El Paso MLP") bought a 25% interest in Southern Natural Gas Co. ("Southern"). The seller was El Paso Corporation ("El Paso Parent"), the parent company of the Partnership's general partner, El Paso Pipeline GP Company, L.L.C. (the "General Partner"). The plaintiffs have challenged the transaction, claiming that the defendants violated their express contractual obligations and the implied covenant of good faith and fair dealing or, alternatively, aided and abetted those wrongful acts. After the close of fact and expert discovery, the defendants moved for summary judgment. This decision grants their motion.

## I.     FACTUAL BACKGROUND

The facts are drawn from the materials submitted in connection with the motion for summary judgment. When considering the defendants' motion, conflicts in the evidence must be resolved in favor of the plaintiffs and all reasonable inferences drawn in their favor. At this stage of the case, the court cannot weigh the evidence, decide among competing inferences, or make factual findings.

### A.     The Partnership

El Paso MLP is a Delaware limited partnership that operates as a publicly traded master limited partnership ("MLP"). Headquartered in Houston, Texas, El Paso MLP owns interests in companies that operate natural gas pipelines and storage facilities throughout the United States.

El Paso Parent indirectly owns 100% of the General Partner, which in turn owns a 2% general partner interest in El Paso MLP. The general partner interest provides the

General Partner with a 2% economic interest in El Paso MLP and, more importantly, gives the General Partner control over El Paso MLP. The General Partner also owns all of El Paso MLP's incentive distribution rights ("IDRs"), which are a class of non-voting units authorized by the Partnership's First Amended and Restated Agreement of Limited Partnership (the "LP Agreement" or "LPA"). The IDRs are a form of interest in El Paso MLP distinct from the general partner interest, which is owned by the General Partner, and the limited partner interest, which is represented by the common units.

The IDRs give the General Partner a preferential claim to cash flows generated by El Paso MLP.

> IDRs incentivize a general partner, whose economic general partner interest in the MLP is otherwise fixed and relatively small, to manage the MLP to maximize cash flow for the LP units. The IDRs are a form of pay for performance, with performance measured in distributable cash. In MLP lingo, as the operating partnership performs better, the general partner "rides up the splits" and receives a greater share of the incremental cash generated by its efforts. . . .
>
> While helpful as a means of incentivizing general partner performance and aligning interests, IDRs have downsides. Most obviously, the overhang of the IDR claim on cash flows limits the distributions available to the LP units. This reduces the attractiveness of LP units, resulting in a lower trading price and making them less attractive as a source of new money or as an acquisition currency. Equally important, as the operating partnership performs better, the increasing IDR claim drives up its cost of equity capital, which limits its ability to undertake new projects.

*Lonergan v. EPE Hldgs., LLC*, 5 A.3d 1008, 1012-13 (Del. Ch. 2010) (footnote omitted).

The LP Agreement establishes the terms of the IDRs, including the right to preferential cash flows. Under Article VI of the LP Agreement, El Paso MLP must distribute all "Available Cash" from the Partnership's operating and capital surplus

within forty-five days of the end of each fiscal quarter. Section 6.4 of the LP Agreement allocates the percentage share of the Available Cash among the General Partner, the limited partners, and the IDRs. The percentage allocated to the IDRs escalates depending on the level of quarterly distributions received by the limited partners on their common units. The following table illustrates the allocation:

| Quarterly Distribution Per Common Unit | Allocations of Incremental Available Cash | | |
|---|---|---|---|
| | General Partner | IDRs | Limited Partners |
| From Zero up to and including the Minimum Quarterly Distribution ($0.28750) | 2% | 0% | 98% |
| From the Minimum Quarterly Distribution up to and including the First Target Distribution ($0.33063) | 2% | 0% | 98% |
| From the First Target Distribution up to and including the Second Target Distribution ($0.35938) | 2% | 13% | 85% |
| From the Second Target Distribution up to and including the Third Target Distribution ($0.43125) | 2% | 23% | 75% |
| Above the Third Target Distribution | 2% | 48% | 50% |

In the jargon of the MLP trade, the level at which 48% of each incremental dollar flows to the IDRs is known as the "high splits." Once at that level, because the General Partner owns both the 2% general partner interest and all of the IDRs, the General Partner receives 50% of each incremental dollar of available cash. When the General Partner also owns common units, the take is even higher because the General Partner also receives its *pro rata* share of the amounts distributed to the limited partner interests.

At the time of the transaction challenged in this litigation, El Paso Parent owned, either through the General Partner or its affiliates, approximately 48.9% of El Paso

3

MLP's outstanding common units. This meant that when El Paso MLP reached the high splits, El Paso Parent would receive 74.45% of each incremental dollar of Available Cash, broken down as follows: (i) 2.00% from the General Partner interest; (ii) 48.00% from the IDRs, and (iii) 24.45% from its common units.

At the time of the challenged transaction, El Paso Parent was itself a publicly traded Delaware corporation headquartered in Houston, Texas. In May 2012, El Paso Parent was acquired and became a wholly owned subsidiary of Kinder Morgan, Inc.

## B. The Southern Transaction

On February 8, 2011, El Paso Parent proposed to sell to El Paso MLP a 22% general partner interest in Southern for a purchase price of $587 million, excluding debt. This decision refers to the transaction as the "Drop-Down."

Southern is a natural gas pipeline and storage company with a network of approximately 8,000 miles of pipelines extending across the southeastern United States. At the time of the proposal, El Paso MLP already owned a 60% general partner interest in Southern that it had acquired from El Paso Parent through earlier drop-down transactions, including 10% transferred to El Paso MLP upon its formation, 15% acquired in September 2008, 20% acquired in June 2010, and 15% acquired in November 2010.

El Paso Parent's proposal contemplated that El Paso MLP would finance the Drop-Down with proceeds from the public issuance of up to 12 million common units, a draw on the Partnership's revolving credit facility, and a cash contribution from El Paso Parent to maintain the General Partner's 2% general partner interest in El Paso MLP. El Paso MLP had used the same financing structure for previous drop-down transactions.

4

The proposal gave El Paso MLP the option to purchase an additional 3% interest in Southern on the same terms, depending on the success of El Paso MLP's unit issuance. If El Paso MLP exercised the option, it would acquire in total an additional 25% general partner interest in Southern, for aggregate ownership of 85%.

## C.    The Contractual Approval Framework

Because El Paso Parent controlled El Paso MLP through its ownership of the General Partner and also owned the interest in Southern that El Paso MLP would acquire, the Drop-Down created a conflict of interest for the General Partner. The LP Agreement establishes contractual requirements for such a transaction.

As authorized by the Delaware Limited Partnership Act, the LP Agreement eliminates all common law duties, including fiduciary duties, that the General Partner, El Paso Parent, or the directors might otherwise owe to El Paso MLP and its limited partners. LPA § 7.9(e). In place of common law duties, the LP Agreement substitutes contractual commitments. When the General Partner takes action in its capacity as the General Partner, and when the decision involves a conflict of interest for the General Partner, Section 7.9(a) of the LP Agreement establishes the governing standard. Section 7.9(a) provides that the action will be "permitted and deemed approved by all Partners" and "not constitute a breach" of the LP Agreement or "any duty stated or implied by law or equity" as long as the General Partner proceeds in one of four contractually specified ways. *Id.* § 7.9(a). The relevant contractual language states:

> Unless otherwise expressly provided in this Agreement . . . , whenever a potential conflict of interest exists or arises between the General Partner . . . , on the one hand, and the Partnership . . . , any Partner or any Assignee,

on the other, any resolution or course of action by the General Partner . . . in respect of such conflict of interest shall be permitted and deemed approved by all Partners, and shall not constitute a breach of this Agreement, . . . or of any duty stated or implied by law or equity, if the resolution or course of action in respect of such conflict of interest is (i) approved by Special Approval, (ii) approved by the vote of a majority of the Outstanding Common Units (excluding Common Units owned by the General Partner and its Affiliates), (iii) on terms no less favorable to the Partnership than those generally being provided to or available from unrelated third parties or (iv) fair and reasonable to the Partnership, taking into account the totality of the relationships between the parties involved (including other transactions that may be particularly favorable or advantageous to the Partnership).

*Id.*

For the Drop-Down, the General Partner elected to proceed by way of Special Approval. The LP Agreement defined this form of approval as "approval by a majority of the members of the Conflicts Committee acting in good faith." *Id.* § 1.1. The LP Agreement in turn defined the Conflicts Committee as

a committee of the Board of Directors of the General Partner composed of two or more directors, each of whom (a) is not a security holder, officer or employee of the General Partner, (b) is not an officer, director or employee of any Affiliate of the General Partner, (c) is not a holder of any ownership interest in the Partnership Group other than Common Units and awards that may be granted to such director under the Long Term Incentive Plan and (d) meets the independence standards required of directors who serve on an audit committee of a board of directors established by the Securities Exchange Act and the rules and regulations of the Commission thereunder and by the National Securities Exchange on which the Common Units are listed or admitted to trading.

*Id.* At El Paso MLP, the Conflicts Committee was not a standing committee of the GP Board, but rather a committee constituted on an *ad hoc* basis to consider specific conflict-of-interest transactions.

In February 2011, when El Paso Parent proposed the Drop-Down, the members of the board of directors of the General Partner (the "GP Board") were defendants Douglas L. Foshee, James C. Yardley, John R. Sult, D. Mark Leland, Ronald L. Kuehn, Jr., William A. Smith, and Arthur C. Reichstetter. Foshee, Yardley, Sult, and Leland held management positions with El Paso Parent or the General Partner. Foshee was the President and CEO of El Paso Parent. Yardley served as an Executive Vice President of El Paso Parent and as President and CEO of the General Partner. Sult served as CFO of El Paso Parent and the General Partner. Leland served as an Executive Vice President of El Paso Parent and president of El Paso Midstream Group, Inc., having previously served as the CFO of El Paso Parent and the General Partner. Each of these members of the GP Board beneficially owned equity stakes in El Paso Parent that dwarfed their equity stakes in El Paso MLP.

The other three members of the GP Board were outside directors, although two had past ties to El Paso Parent. Kuehn was Interim CEO of El Paso Parent in 2003 and served as Chairman of the Board of El Paso Parent from 2003 until 2009, two years before the challenged transaction took place. Smith was an Executive Vice President of El Paso Parent and Chairman of El Paso Merchant Energy's Global Gas Group until 2002. Reichstetter was the only director without past ties to El Paso Parent.

To evaluate the Drop-Down, the GP Board established a Conflicts Committee consisting of Kuehn, Reichstetter, and Smith. Reichstetter served as Chair. The committee retained Tudor, Pickering, Holt & Co. ("Tudor") as its financial advisor and Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") as its legal advisor.

7

**D.      The Special Approval Process**

On February 9, 2011, the Conflicts Committee held its first formal meeting.  After the meeting, Tudor and Akin Gump began conducting due diligence.

The Conflicts Committee met for the second time on February 15, 2011.  Tudor summarized its initial due diligence, noting (i) the status of various developmental and expansion projects involving Southern, (ii) adjustments made to El Paso MLP's financial projections since the prior acquisition of an interest in Southern, and (iii) El Paso MLP's strong financial performance since the earlier transaction.  After the meeting, Reichstetter asked Tudor to explore whether MLPs paid lower multiples when acquiring assets from their sponsors if the sponsors were receiving higher splits under the IDRs.  Reichstetter also asked Tudor to research which sponsors of the fifteen largest MLPs had agreed to reduce their share of the IDR cash flows.

The Conflicts Committee met again on February 24, 2011.  Tudor made a presentation that included (i) a financial overview of El Paso MLP and its market performance, capital structure, and projected capital expenditures, (ii) a financial overview of Southern and its projected EBITDA, distributable cash flows, and projected capital expenditures, (iii) a comparison of El Paso Parent's prior financial projections for Southern with its most recent projections, and (iv) a comparison of El Paso MLP's debt levels with those of its competitors.  Tudor advised that the transaction was expected to be more accretive on a per-unit basis to El Paso MLP's common unitholders than previous drop-down transactions.  After the meeting, Reichstetter asked Tudor to analyze

8

the growth rates for El Paso MLP's component businesses, for EL Paso MLP as a whole, and on a *pro forma* basis assuming the Drop-Down took place.

The Conflicts Committee next met on February 28, 2011. The members and their advisors discussed the anticipated timing of the transaction and the related public offering.

On March 2, 2011, the Conflicts Committee met in person, and Tudor presented an updated financial analysis. Tudor's presentation addressed the issues that Reichstetter had raised, including the effect of the IDRs on the distribution of cash and precedent transactions involving adjustments to IDRs. After the meeting, the Conflicts Committee attempted unsuccessfully to convince El Paso Parent to take a lower price.

The next day, the Conflicts Committee met for the sixth and final time. Tudor formally opined that the proposed transaction was fair from a financial point of view to holders of El Paso MLP common units other than holders affiliated with El Paso Parent. After receiving Tudor's opinion, the Conflicts Committee granted Special Approval for the transaction. On March 4, the entire GP Board met and, relying on the Conflicts Committee's grant of Special Approval, approved the Drop-Down.

On March 8, 2011, El Paso MLP publicly announced that it was acquiring a 22% general partner interest in Southern with the option to acquire an additional 3% interest. El Paso MLP also announced its plan to issue 12,000,000 common units to the public with an underwriters' option to sell up to an additional 1,800,000 units. All 13,800,000 units were sold. On March 9, El Paso MLP exercised its option to acquire the additional 3% interest in Southern. The Drop-Down closed on March 14. The total purchase price

9

paid by El Paso MLP to El Paso Parent in the Drop-Down was $895 million, consisting of $667 million in cash and the assumption of $228 million of Southern's existing debt.

**E.     This Litigation**

On October 24, 2011, the plaintiffs made a demand for books and records relating to the Drop-Down. In January 2012, El Paso MLP provided the Conflicts Committee's meeting minutes and Tudor's financial analyses.

On May 11, 2012, the plaintiffs filed their complaint. Counts I and II asserted claims against the defendants for breaching the express terms of the LP Agreement and the implied covenant of good faith and fair dealing. According to the plaintiffs, the IDRs significantly reduced the economic benefit of the Drop-Down for limited partners unaffiliated with the General Partner. The plaintiffs alleged that Tudor's financial analysis failed to account for the IDRs and that the Conflicts Committee disregarded the effects of the IDRs. According to the plaintiffs, after taking the IDRs into account, the Drop-Down was dilutive, rather than accretive, for limited partners unaffiliated with the General Partner. The plaintiffs contended that the Conflicts Committee consequently acted in subjective bad faith when evaluating and approving the Drop-Down. Because the Conflicts Committee could not have believed in good faith that the Drop-Down was in the best interests of the Partnership, the plaintiffs asserted that the General Partner breached Section 7.9(a) of the LP Agreement. Counts III and IV sought to impose secondary liability on the members of the GP Board for aiding and abetting the General Partner's purported breaches.

On November 5, 2012, this court denied the defendants' motion to dismiss the complaint for failure to state a claim on which relief can be granted. The court found it reasonably conceivable that the Conflicts Committee could be found at trial to have acted in bad faith because the complaint alleged that the members of the Conflicts Committee (i) disregarded the IDRs and (ii) approved a transaction that was not accretive to the limited partners. At the same time, however, the court rejected the argument that the members of the Conflicts Committee failed to meet the independence requirements set forth in the LP Agreement such that they could not have given Special Approval. The plaintiffs have not challenged or sought to revisit this ruling, which is law of the case. Consequently, for purposes of this decision, it is undisputed that the Conflicts Committee was duly constituted and met the requirements of the LP Agreement.

On May 19, 2014, this court granted the plaintiffs' motion to certify a class consisting of all holders of El Paso MLP common units as of March 4, 2011, except the defendants and their affiliates. In granting the motion, the court found that the claims were not exclusively derivative and could support a direct characterization.

## II. LEGAL ANALYSIS

Under Court of Chancery Rule 56, summary judgment "shall be rendered forthwith" if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Ct. Ch. R. 56(c). The moving party bears the initial burden of demonstrating that, even with the evidence construed in the light most favorable to the non-moving party, there are no genuine issues of material fact. *Brown v. Ocean Drilling & Exploration Co.*, 403 A.2d 1114, 1115 (Del. 1979). If the moving

11

party meets this burden, then to avoid summary judgment the non-moving party must "adduce some evidence of a dispute of material fact." *Metcap Sec. LLC v. Pearl Senior Care, Inc.*, 2009 WL 513756, at *3 (Del. Ch. Feb. 27, 2009), *aff'd*, 977 A.2d 899 (Del. 2009) (TABLE); *accord Brzoska v. Olson*, 668 A.2d 1355, 1364 (Del. 1995).

On an application for summary judgment, "the court must view the evidence in the light most favorable to the non-moving party." *Merrill v. Crothall-American, Inc.*, 606 A.2d 96, 99 (Del. 1992). "Any application for such a judgment must be denied if there is any reasonable hypothesis by which the opposing party may recover, or if there is a dispute as to a material fact or the inferences to be drawn therefrom." *Vanaman v. Milford Mem'l Hosp., Inc.*, 272 A.2d 718, 720 (Del. 1970).

> [T]he function of the judge in passing on a motion for summary judgment is not to weigh evidence and to accept that which seems to him to have the greater weight. His function is rather to determine whether or not there is any evidence supporting a favorable conclusion to the nonmoving party. When that is the state of the record, it is improper to grant summary judgment.

*Cont'l Oil Co. v. Pauley Petroleum, Inc.*, 251 A.2d 824, 826 (Del. 1969). "The test is not whether the judge considering summary judgment is skeptical that [the non-movant] will ultimately prevail." *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1150 (Del. 2002). "If the matter depends to any material extent upon a determination of credibility, summary judgment is inappropriate." *Id.* When a party's state of mind is at issue, a credibility determination is "often central to the case." *Johnson v. Shapiro*, 2002 WL 31438477, at *4 (Del. Ch. Oct. 18, 2002).

## A. Breach Of The LP Agreement

Counts I and II of the Complaint contend that the defendants breached both their express and implied contractual obligations under the LP Agreement. Summary judgment is entered in favor of the defendants on these claims.

### 1. The Defendants Other Than The General Partner

As a threshold matter, summary judgment on Counts I and II of the Complaint is granted in favor of all defendants other than the General Partner. Counts I and II assert a claim for breach of contract. Count I asserts it as a direct claim; Count II asserts it derivatively. "It is a general principle of contract law that only a party to a contract may be sued for breach of that contract." *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 172 (Del. 2002). The General Partner is the only defendant that was a party to the LP Agreement. The defendants other than the General Partner were not parties to the LP Agreement and are entitled to summary judgment on Counts I and II.

### 2. The Express Contractual Standard

As noted in the Factual Background, *supra*, the General Partner chose to comply with Section 7.9(a) of the LP Agreement by seeking and obtaining Special Approval. For Special Approval to have been properly granted, the conflict-of-interest transaction must have received "approval by a majority of the members of the Conflicts Committee acting in good faith." LPA § 1.1. The LP Agreement defines "good faith" for such purposes in terms of the members' belief that the conflict-of-interest transaction is in the best interests of El Paso MLP. The pertinent contractual language states: "In order for a determination or other action to be in 'good faith' for purposes of this Agreement, the

Person or Persons making such determination or taking or declining to take such other action must believe that the determinations or other action is in the best interests of the Partnership." *Id.* § 7.9(b). Two aspects of the resulting contractual test warrant emphasis: (i) subjective belief and (ii) best interests of the Partnership.

### a. Subjective Belief

The first aspect of the contractual test that merits further discussion is the standard for good faith, which is subjective, not objective. The Delaware Supreme Court has held that the definition of "good faith" in the LP Agreement is satisfied "if the actor *subjectively believes* that it is in the best interests of [the partnership]." *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 104 (Del. 2013). The high court stressed that this language "eschews an objective standard when interpreting the unqualified term 'believes.'" *Id.* When applying this test, "the ultimate inquiry must focus on the subjective belief of the specific directors accused of wrongful conduct." *Id.* at 107. The Delaware Supreme Court admonished that "[t]rial judges should avoid replacing the actual directors with hypothetical reasonable people." *Id.*

Despite the subjective nature of the inquiry, trial judges confront cognitive limitations inherent in the human condition. These limitations include a lack of psychic powers. As the *Encore Energy* opinion trenchantly observed, "[d]espite their expertise, the members of the Court of Chancery cannot peer into the hearts and souls of directors." *Id.* at 106 (internal quotation marks omitted).

Without the ability to read minds, a trial judge only can infer a party's subjective intent from external indications. Objective facts remain logically and legally relevant to

14

the extent they permit an inference that a defendant lacked the necessary subjective belief. *Id.* In *Encore Energy*, the high court provided illustrations of this concept in practice:

> Some actions may objectively be so egregiously unreasonable . . . that they "seem[] essentially inexplicable on any ground other than [subjective] bad faith." It may also be reasonable to infer subjective bad faith in less egregious transactions when a plaintiff alleges objective facts indicating that a transaction was not in the best interests of the partnership and that the directors knew of those facts. Therefore, objective factors may inform an analysis of a defendant's subjective belief to the extent they bear on the defendant's credibility when asserting that belief.
>
> . . . [T]he ultimate inquiry must focus on the subjective belief of the specific directors accused of wrongful conduct. The directors' personal knowledge and experience will be relevant to a subjective good faith determination, which must focus on measuring the directors' approval of a transaction against their knowledge of the facts and circumstances surrounding the transaction.

*Id.* at 106-08 (first two alterations in original and footnote omitted).

The *Encore Energy* decision discussed the subjective good faith standard as applied at the pleadings stage. The same legal principles apply at the summary judgment stage, but instead of resting on allegations of objective facts, the plaintiff must provide some evidence to support its position. *See* Ct. Ch. R. 56(c) (explaining that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law"). If the plaintiff can meet this burden, then the court must make a credibility determination regarding the defendant's state of mind. *Johnson*, 2002 WL 31438477, at *4. "In such cases, the court should evaluate the demeanor of the witnesses whose

15

states of mind are at issue during examination at trial." *Id.* "Even after a trial, a judge may need to make credibility determinations about a defendant's subjective beliefs by weighing witness testimony against objective facts." *Encore Energy*, 72 A.3d at 106.

### b.    Best Interests Of The Partnership

The second aspect of the contractual test that deserves additional discussion is the referent for the Conflicts Committee's good faith belief, namely that the conflict-of-interest transaction is in the best interests of the Partnership. The contractual standard does not require the Conflicts Committee to make a determination regarding the best interests of the limited partners as a class. *See Sonet v. Timber Co.*, 722 A.2d 319, 325 (Del. Ch. 1998) ("In any event, pursuant to § 6(b) of the agreement, in situations where the General Partner is authorized to act according to its own discretion, there is no *requirement* that the General Partner consider the interests of the limited partners in resolution of a conflict of interest.").

The contractual standard of "best interests of the Partnership" departs from the fiduciary standard of conduct that applies in the corporate arena and which would apply by default absent the contractual modification or elimination of fiduciary duties in an alternative entity agreement. A board of directors owes fiduciary duties to the corporation for the ultimate benefit of its residual risk bearers, *viz.* the class of claimants represented by the undifferentiated equity. When exercising their authority, directors

must seek "to promote the value of the corporation for the benefit of its stockholders."[1]

"It is, of course, accepted that a corporation may take steps, such as giving charitable contributions or paying higher wages, that do not maximize corporate profits currently. They may do so, however, because such activities are rationalized as producing greater profits over the long-term." Leo E. Strine, Jr., *Our Continuing Struggle with the Idea that For-Profit Corporations Seek Profit*, 47 Wake Forest L. Rev. 135, 147 n.34 (2012). Decisions of this nature benefit the corporation as a whole and, by increasing the value of the corporation, increase the share of value available for the residual claimants. The resulting relationship is an instrumental one in which directors may promote the interests of other corporate constituencies for the ultimate benefit of the entity's residual claimants. "[S]tockholders' best interest must always, within legal limits, be the end. Other constituencies may be considered only instrumentally to advance that end." *Id.*

Because of the obligation to maximize the value of the corporation for the benefit of the undifferentiated equity, directors must consider how their decisions affect the common stockholders. When making decisions that have divergent implications for different aspects of the capital structure, a board's fiduciary duties call for the directors to

---

[1] *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 34 (Del. Ch. 2010); *accord N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007) ("The directors of Delaware corporations have the legal responsibility to manage the business of a corporation for the benefit of its shareholder[ ] owners." (internal quotation marks omitted)); *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 955 (Del. 1985) (citing "the basic principle that corporate directors have a fiduciary duty to act in the best interests of the corporation's stockholders"); *see also* Leo E. Strine, Jr. et al., *Loyalty's Core Demand: The Defining Role of Good Faith in Corporation Law*, 98 Geo. L.J. 629, 634 (2010) ("[I]t is essential that directors take their responsibilities seriously by actually trying to manage the corporation in a manner advantageous to the stockholders.").

17

prefer the interests of the common stock, so long as that can be done in compliance with the corporation's commitments to contractual claimants.[2]

The LP Agreement eliminates any analogous duty to prefer the interests of the limited partners. Rather than requiring the Conflicts Committee to reach a subjective belief that the Drop-Down was in the best interests of El Paso MLP and its limited partners, the LP Agreement requires only that the Conflicts Committee believe subjectively that the Drop-Down was in the best interests of El Paso MLP. When

---

[2] *See Gheewalla*, 930 A.2d at 101 ("When a solvent corporation is navigating in the zone of insolvency, the focus for Delaware directors does not change: directors must continue to discharge their fiduciary duties to the corporation and its shareholders by exercising their business judgment in the best interests of the corporation for the benefit of its shareholder owners."); *LC Capital Master Fund, Ltd. v. James*, 990 A.2d 435, 452 (Del. Ch. 2010) ("[I]t is the duty of directors to pursue the best interests of the corporation and its common stockholders, if that can be done faithfully with the contractual promises owed to the preferred."); *Prod. Res. Gp., L.L.C. v. NCT Gp., Inc.*, 863 A.2d 772, 790 (Del. Ch. 2004) ("Having complied with all legal obligations owed to the firm's creditors, the board would . . . ordinarily be free to take economic risk for the benefit of the firm's equity owners, so long as the directors comply with their fiduciary duties to the firm by selecting and pursuing with fidelity and prudence a plausible strategy to maximize the firm's value."); *Blackmore P'rs, L.P. v. Link Energy LLC*, 864 A.2d 80, 86 (Del. Ch. 2004) ("[T]he allegation that the Defendant Directors approved a sale of substantially all of [the company's] assets and a resultant distribution of proceeds that went exclusively to the company's creditors raises a reasonable inference of disloyalty or intentional misconduct. Of course, it is also possible to infer (and the record at a later stage may well show) that the Director Defendants made a good faith judgment, after reasonable investigation, that there was no future for the business and no better alternative . . . . [I]t would appear that no transaction could have been worse for the unit holders and reasonable to infer . . . that a properly motivated board of directors would not have agreed to a proposal that wiped out the value of the common equity and surrendered all of that value to the company's creditors."); *Equity-Linked Investors, L.P. v. Adams*, 705 A.2d 1040, 1042 (Del. Ch. 1997) (Allen, C.) ("[G]enerally it will be the duty of the board, where discretionary judgment is to be exercised, to prefer the interests of common stock—as the good faith judgment of the board sees them to be—to the interests created by the special rights, preferences, *etc.*, of preferred stock."); *see also Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 191-98 (Del. Ch. 2006) (applying business judgment rule to dismiss claims that directors of solvent corporation breached their duties by taking action to benefit subsidiary's sole stockholder at the expense of its creditors), *aff'd*, 931 A.2d 438 (Del. 2007) (TABLE).

considering that issue, the Conflicts Committee has discretion to consider the full range of entity constituencies, including but not limited to employees, creditors, suppliers, customers, the general partner, the IDR holders (here, one in the same with the general partner), and of course the limited partners. In place of a single beneficiary of fiduciary duties, the LP Agreement confers contractual discretion on the Conflicts Committee to balance the competing interests of the Partnership's various entity constituencies when determining whether a conflict-of-interest transaction is in the best interests of the Partnership. To measure compliance with this standard of conduct, the Special Approval provision establishes a standard of review that is not framed in terms of reasonableness, fairness, arms'-length pricing, or some other objective measure. Rather, the standard of review asks only whether a majority of the Conflicts Committee subjectively believed that they complied with the operative standard of conduct.

### c. Applying The Contractual Standard

To earn summary judgment in their favor, the defendants must show that there is no genuine issue of material fact about whether the members of the Conflicts Committee believed subjectively, in good faith, that the Drop-Down was in the best interests of the Partnership. If the evidence, viewed in the light most favorable to the plaintiffs, creates a genuine issue of fact as to the subjective belief of the Conflicts Committee on this issue, then summary judgment should be denied. Even under this plaintiff-friendly standard, the defendants' motion for summary judgment is granted.

For purposes of evaluating the evidence about the subjective belief of the Conflicts Committee, the plaintiffs have made important concessions. The plaintiffs do *not* claim

19

that El Paso MLP paid an excessive price in the Drop-Down or that the Drop-Down otherwise harmed El Paso MLP as an entity. Each of the members of the Conflicts Committee testified that they believed, subjectively, that the Drop-Down benefited El Paso MLP as an entity. What the plaintiffs dispute is whether the Drop-Down was in the best interests of the limited partners. Moreover, their argument is not that the Drop-Down did not benefit the limited partners, because they now concede that the distributions received by the holders of common units did increase. Rather, the plaintiffs argue that the Drop-Down did not benefit the limited partners enough relative to what the General Partner received.

If the General Partner owed fiduciary duties to the limited partners, and if the standard of review was framed in terms of range-of-reasonableness or fairness, then the plaintiffs' evidence would be sufficient to defeat summary judgment and require a trial. But the LP Agreement eliminates all fiduciary duties, and the LP Agreement contains a contractual standard that turns on whether a majority of the members of the Conflicts Committee believed subjectively, in good faith, that the Drop-Down was in the best interests of El Paso MLP. That contractual standard is dispositive.

Under the terms of the LP Agreement, the Conflicts Committee is presumed to have acted in good faith, and the plaintiffs must rebut that presumption. LPA § 7.9(a). The plaintiffs must therefore identify some evidence from which a fact-finder could conclude that the Conflicts Committee did not believe that the Drop-Down was in the best interests of El Paso MLP. There is no such evidence. The actions of the Conflict Committee were consistent with individuals proceeding in subjective good faith. The

20

Conflicts Committee retained and consulted with financial and legal advisors who were experienced in working with midstream MLPs and had specific familiarity with El Paso MLP and Southern. The Conflicts Committee met formally six times. Tudor attended each of the meetings and provided three presentations. The members of the Conflicts Committee asked questions about the IDRs and transactions involving MLPs in the high splits, and Tudor investigated the issues raised by the Conflicts Committee and provided answers. As noted, the plaintiffs have conceded that the Drop-Down did not harm El Paso MLP and recognized that the Drop-Down conferred some benefit on the limited partners (albeit, say the plaintiffs, not enough).

Given the evidence and these concessions, the plaintiffs have failed to raise a genuine issue of material fact about the Conflicts Committee's compliance with the contractual standard. Construing the evidence in the plaintiffs favor, it supports at best for the plaintiffs an inference that the Conflicts Committee performed its job poorly. The evidence does not support a reasonable inference that the Conflicts Committee did not subjectively believe that the Drop-Down was in the best interests of El Paso MLP. *See Encore Energy*, 72 A.3d at 109 ("showing that the Conflict Committee members may have negotiated poorly does not permit a reasonable inference that they subjectively believed they were acting against [the Partnership's] best interests"). Summary judgment is granted in favor of the remaining defendant—the General Partner—to the extent Counts I and II assert a breach of the express provisions of the LP Agreement.

21

### 3. The Implied Covenant Claim

Counts I and II of the Complaint also contend that the General Partner breached implicit obligations in the LP Agreement created by the implied covenant of good faith and fair dealing. In a recent decision, the Delaware Supreme Court held that a plaintiff stated a claim that a Conflicts Committee had breached the implied covenant of good faith and fair dealing by relying on fairness opinion that opined as to the fairness of the consideration to the limited partners but "did not value the consideration that the LP unitholders actually received." *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 422 (Del. 2013), *overruled in part on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013). The plaintiffs attempt to apply *Gerber* to the current case by arguing that Tudor's fairness opinion excluded the dilution resulting from the issuance of additional common units to finance the Drop-Down.

#### a. The Standard For An Implied Covenant Claim

The implied covenant of good faith and fair dealing is the doctrine by which Delaware law cautiously supplies terms to fill gaps in the express provisions of a specific agreement. Despite the appearance in its name of the terms "good faith" and "fair dealing," the covenant does not establish a free-floating requirement that a party act in some morally commendable sense. *Gerber*, 67 A.3d at 418. Nor does satisfying the implied covenant necessarily require that a party have acted in subjective good faith. *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 50 A.3d 434, 442, 444 (Del. Ch. 2012) (observing that "[t]here are references in Delaware case law to the implied covenant turning on the breaching party having a culpable mental

22

state" but finding that "[t]he elements of an implied covenant claim remain those of a breach of contract claim" and that "[p]roving a breach of contract claim does not depend on the breaching party's mental state"), *rev'd on other grounds*, 68 A.3d 665 (Del. 2013). When used with the implied covenant, the term "good faith" contemplates "*faithfulness to the scope, purpose, and terms of the parties' contract*." *Gerber*, 67 A.3d at 419; *accord* Restatement (Second) of Contracts § 205 cmt. a (1981) ("Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party . . . ."). The concept of "fair dealing" similarly refers to "a commitment to deal 'fairly' in the sense of consistently with the terms of the parties' agreement and its purpose." *Gerber*, 67 A.3d at 419. The parameters of both concepts turn not on a court's beliefs about what was morally or equitably appropriate under the circumstances, but rather "*on the contract itself and what the parties would have agreed upon had the issue arisen when they were bargaining originally*." *Id.*

When presented with an implied covenant claim, a court first must engage in the process of contract construction to determine whether there is a gap that needs to be filled. *See* Mohsen Manesh, *Express Contract Terms and the Implied Contractual Covenant of Delaware Law*, 38 Del. J. Corp. L. 1, 19 (2013). During this phase, the court decides whether the language of the contract expressly covers a particular issue, in which case the implied covenant will not apply, or whether the contract is silent on the subject, revealing a gap that the implied covenant might fill. *Id.* A court must determine whether a gap exists because "[t]he implied covenant will not infer language that contradicts a

clear exercise of an express contractual right." *Nemec v. Shrader*, 991 A.2d 1120, 1127 (Del. 2010). "[B]ecause the implied covenant is, by definition, implied, and because it protects the spirit of the agreement rather than the form, it cannot be invoked where the contract itself expressly covers the subject at issue." *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *10 (Del. Ch. May 7, 2008). "[I]mplied covenant analysis will only be applied when the contract is truly silent with respect to the matter at hand . . . ." *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1032 (Del. Ch. 2006).

If a contractual gap exists, then the court must determine whether the implied covenant should be used to supply a term to fill the gap. Not all gaps should be filled.

> The most obvious reason a term would not appear in the parties' express agreement is that the parties simply rejected that term ex ante when they articulated their contractual rights and obligations. Perhaps, for example, the parties . . . considered the term, and perhaps [after] some give-and-take dickering, the parties agreed the term should not be made part of their agreement. They thus rejected the term by purposefully omitting the term.

Manesh, *supra*, at 28 (footnote omitted). Under those circumstances, the implied covenant should not be used to fill the gap with the omitted term. To do so would grant parties "contractual protections that they failed to secure for themselves at the bargaining table." *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 707 (Del. Ch.), *aff'd*, 861 A.2d 1251 (Del. 2004). A court must not use the implied covenant to "rewrite [a] contract" that a party "now believes to have been a bad deal." *Nemec*, 991 A.2d at 1126. "Parties have a right to enter into good and bad contracts, the law enforces both." *Id.*

24

But a contractual gap may exist for other reasons. "No contract, regardless of how tightly or precisely drafted it may be, can wholly account for every possible contingency." *Amirsaleh v. Bd. of Trade of City of New York, Inc.*, 2008 WL 4182998, at *1 (Del. Ch. Sept. 11, 2008). Even the most skilled and sophisticated parties will necessarily "fail to address a future state of the world . . . because contracting is costly and human knowledge imperfect." *Lonergan*, 5 A.3d at 1018. "In only a moderately complex or extend[ed] contractual relationship, the cost of attempting to catalog and negotiate with respect to all possible future states of the world would be prohibitive, if it were cognitively possible." *Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.*, 1991 WL 277613, at *23 (Del. Ch. Dec. 30, 1991) (Allen, C.). And "parties occasionally have understandings or expectations that were so fundamental that they did not need to negotiate about those expectations." *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986) (Allen, C.) (quoting *Corbin on Contracts* § 570, at 601 (Kaufman Supp. 1984)).

Under these or other circumstances, it may be appropriate to fill a gap using the implied covenant. The Delaware Supreme Court has provided guidance in this area by admonishing against a free-wheeling approach. Invoking the doctrine is a "cautious enterprise." *Nemec*, 991 A.2d at 1125. Implying contract terms is an "occasional necessity . . . to ensure [that] parties' reasonable expectations are fulfilled." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (internal quotation marks omitted). Its use should be "rare and fact-intensive, turning on issues of compelling

25

fairness." *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998).

Assuming a gap exists and the court determines that it should be filled, the court must determine how to fill it. At this stage, a reviewing court does not simply introduce its own notions of what would be fair or reasonable under the circumstances. "The implied covenant seeks to enforce the parties' contractual bargain by implying only those terms that the parties would have agreed to during their original negotiations if they had thought to address them." *Gerber*, 67 A.3d at 418. To supply an implicit term, the court "looks to the past" and asks "what the parties would have agreed to themselves had they considered the issue in their original bargaining positions at the time of contracting." *Id.* The court seeks to determine "whether it is clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith— had they thought to negotiate with respect to that matter." *Id.* "Terms are to be implied in a contract not because they are reasonable but because they are necessarily involved in the contractual relationship so that the parties must have intended them . . . ." *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 1997 WL 525873, at *5 (Del. Ch. Aug. 13, 1997), *aff'd*, 708 A.2d 989 (Del. 1998).

### b. The Rulings In *Gerber*

The plaintiffs rely on *Gerber* to establish their implied covenant claim. Assessing the implications of *Gerber* requires an understanding of what was at issue in that case.

26

The plaintiff in *Gerber* owned common units in Enterprise GP Holdings, L.P. ("Enterprise Parent"), a publicly traded limited partnership that owned (i) 100% of the general partners of two other publicly traded limited partnerships, Enterprise Products Partners, L.P. ("Enterprise Sub") and Teppco Partners LP ("Teppco Sub"), and (ii) limited partner interests in both Enterprise Sub and Teppco Sub. The plaintiff in *Gerber* challenged two separate transactions in which Enterprise Parent and its affiliates engaged.

The first transaction took place in 2009, when Enterprise Parent sold the entity that served as the general partner of Teppco Sub to Enterprise Sub, allegedly for less than 10% of the entity's actual value. The consideration had two components: (i) Enterprise Sub issued common units valued at $39.95 million to Enterprise Parent, and (ii) the general partner of Enterprise Sub, which Enterprise Parent owned, received an increase in its general partner interest valued at $60 million. The Delaware Supreme Court referred to this transaction as the "2009 Sale." *Gerber*, 67 A.3d at 406. Contemporaneously with the 2009 Sale, Enterprise Parent caused Teppco Sub to merge with a wholly-owned subsidiary of Enterprise, with each common unit of Teppco Sub converted into the right to receive 1.24 common units of Enterprise Sub. The Delaware Supreme Court referred to this transaction as the "Teppco LP Sale." *Id.* The trial court opinion does not mention the Teppco LP Sale, which was addressed in a separate decision of this court that approved a settlement of the litigation challenging that transaction. *Compare Gerber v. Enter. Prods. Hldgs., LLC (Gerber Trial)*, 2012 WL 34442 (Del. Ch. Jan. 6, 2012) (discussing only 2009 Sale), *with Brinckerhoff v. Tex. E. Prods. Pipeline Co.*, 986 A.2d

27

370 (Del. Ch. 2010) (discussing 2009 Sale and Teppco LP Sale). In *Gerber*, the Delaware Supreme Court noted that the 2009 Sale and the Teppco LP Sale closed on the same day and were cross-conditioned on each other. *Gerber*, 67 A.3d at 406 & n.10.

In *Gerber Trial*, the court understood Morgan Stanley & Co. to have opined that the consideration that Enterprise Parent received in the 2009 Sale was fair from a financial point of view to Enterprise Parent and the public holders of the common units. *Gerber Trial*, 2012 WL 34442, at *2. Morgan Stanley "expressed no opinion with respect to . . . the fairness . . . of any particular component of the Consideration (as opposed to the Consideration, taken as a whole)." *Id.* (internal quotation marks omitted). On appeal, the Delaware Supreme Court held that the Court of Chancery "misquoted—and thus perhaps misread" Morgan Stanley's opinion, which in fact addressed in unitary fashion the fairness of the consideration received in both the 2009 Sale and the Teppco LP Sale. *Gerber*, 67 A.3d at 412-13.

The second transaction took place in 2010, when Enterprise Parent merged with and into a wholly owned subsidiary of Enterprise Sub and each common unit of Enterprise Parent was converted into the right to receive 1.5 common units of Enterprise Sub. The *Gerber* decision referred to this transaction as the "2010 Merger." *Gerber*, 67 A.3d at 404. At the time of the transaction, Enterprise Parent possessed valuable derivative claims against Enterprise Sub and its affiliates arising out of the 2009 Sale and certain other conflict-of-interest transactions that took place in 2007. The plaintiff alleged, and the trial court accepted for purposes of decision, that a primary purpose of the 2010 Merger was to eliminate the threat posed by the derivative claims by depriving

28

the public holders of common units of Enterprise Parent of standing to assert the claims. *Gerber Trial*, 2012 WL 34442, at *7. Morgan Stanley opined that the exchange ratio in the 2010 Merger was fair from a financial point of view to the public holders of common units of Enterprise Parent. Morgan Stanley did not value the derivative claims and did not take the derivative claims into account when rendering its fairness opinion. *Id.* at *3; *accord Gerber*, 67 A.2d at 408.

The limited partnership agreement of Enterprise Parent established contractual paths for approving conflict-of-interest transactions that parallel those in this case. Both the 2009 Sale and the 2010 Merger received Special Approval. The plaintiff challenged both transactions, alleging that the defendants breached the express contractual requirements of the conflict-of-interest provision and the implied covenant of good faith and fair dealing. The defendants moved to dismiss the complaint, arguing among other things that the claims could not succeed in light of the following five-step argument. First, Enterprise Parent's limited partnership agreement eliminated all fiduciary duties. Second, under the contractual standard, Enterprise Parent could proceed with a conflict-of-interest transaction if a majority of the members of a committee of the board of directors of the general partner of Enterprise Parent ("Enterprise GP") believed in good faith that the transaction was in the best interests of Enterprise Parent. Third, Section 7.10(b) of Enterprise Parent's limited partnership agreement provided that Enterprise GP would be conclusively presumed to have acted in good faith if Enterprise GP relied on an opinion from an expert, such as a fairness opinion from a financial advisor (the "Conclusive Presumption Provision"). Fourth, the committee obtained fairness opinions

29

from Morgan Stanley for the 2009 Sale and the 2010 Merger. Fifth, the General Partner was entitled to rely on the fairness opinions obtained by the committee for purposes of the Conclusive Presumption Provision. The Court of Chancery granted the motion to dismiss. *See Gerber Trial*, 2012 WL 34442, at *14. This court agreed with the contractual analysis advanced by the defendants and held that the implied covenant of good faith and fair dealing could not be used to contradict the Conclusive Presumption Provision. *Id.* at *13.

On appeal, the Delaware Supreme Court reversed, holding that the plaintiff had pled a breach of the implied covenant as to both transactions. *See Gerber*, 67 A.2d at 418, 422-23. As to the 2009 Sale, the Delaware Supreme Court read Morgan Stanley's fairness opinion differently than the Court of Chancery:

> We pause to focus on the consideration that Morgan Stanley opined was fair in its 2009 opinion. The 2009 Sale closed on October 26, 2009, when [Enterprise Parent] sold [the general partner of Teppco Sub] to [Enterprise Sub]. As noted, that same day, [Enterprise Parent] sold [Teppco Sub] to [Enterprise Sub] in a separate but related transaction—the "Teppco LP Sale." . . . Importantly, in its 2009 opinion, Morgan Stanley opined on the fairness of the total consideration paid for both the 2009 Sale and the Teppco LP Sale. Morgan Stanley did not opine, however, on the fairness of the portion of the total consideration specifically allocable to the 2009 Sale.

67 A.3d at 406. The Delaware Supreme Court noted that the Court of Chancery had understood the opinion to apply only to the 2009 Sale, but stressed that "the 'Consideration' that Morgan Stanley opined was fair to [Enterprise Parent] was the *total* consideration for the *combined* 2009 Sale and Teppco LP Sale—*not* just the component of the total consideration specifically allocable to the 2009 Sale." *Id.* at 412-13.

The nature of Morgan Stanley's opinion raised a question as to whether the general partner could rely on such an opinion for purposes of the Conclusive Presumption Provision. For understandable reasons, the Conclusive Presumption Provision did not establish parameters for a fairness opinion or identify analyses that a financial advisor would have to conduct, doubtless because it would have been costly and difficult (at best) or impossible (at worst) for the drafters to specify all of the potential transactions to which the Conclusive Presumption Provision might apply and the different analyses that should be conducted. This left a gap for the implied covenant to fill.

After considering what the parties would have agreed to had the issue been raised at contract formation, the Delaware Supreme Court held that the parties would not have agreed that the Conclusive Presumption Provision could insulate the 2009 Sale from challenge when the underlying fairness opinion lumped it together with the Teppco LP Sale, thereby avoiding rendering any opinion about what appeared to be a sale of an asset to a related party for less than 10% of its actual value. *Id.* at 421-22. In the words of the Delaware Supreme Court,

> When Gerber purchased EPE LP units, he agreed to be bound by the LPA's provisions . . . . At the time of contracting, however, Gerber could hardly have anticipated that Enterprise Products GP would rely upon a fairness opinion that did not fulfill its basic function—evaluating the consideration the LP unitholders received for purposes of opining whether the transaction was financially fair. Although Section 7.10(b) does not prescribe specific standards for fairness opinions, we may confidently conclude that, had the parties addressed the issue at the time of contracting, they would have agreed that any fairness opinion must address whether the consideration received for [the general partner of Teppco Sub] in 2009 was fair . . . .

*Id.* at 422 (footnote omitted). The high court held that the plaintiff had stated a claim for breach of the implied covenant as to the 2009 Sale because "the parties would not have agreed that the [general partner] could obtain and rely on a fairness opinion so flawed." *Id.* at 424.

The Delaware Supreme Court's analysis of the 2010 Merger proceeded along similar lines. This time, the plaintiff argued that the fairness opinion failed to consider the value of the derivative claims when opining that the consideration received by the holders of common units of Enterprise Parent was fair. *Id.* at 422-23. As before, the Conclusive Presumption Provision did not specify whether the fairness opinion had to consider the value of derivative litigation, creating a gap for the implied covenant to fill. The Delaware Supreme Court again agreed with the plaintiff:

> Gerber could not fairly be charged with having anticipated that [Enterprise GP] would merge [Enterprise Parent] for the purpose of eliminating [Enterprise Parent's] derivative claims, but then rely on a fairness opinion that did not even consider those claims' value. Although Section 7.10(b) does not explicitly so require, we conclude that the parties would certainly have agreed, at the time of contracting, that any fairness opinion contemplated by that provision would address the value of derivative claims where (as here) terminating those claims was a principal purpose of a merger.

*Id.* at 423. The high court "analyze[d] the Complaint independently and conclude[d] that it state[d] legally sufficient claims that [Enterprise GP] breached the implied covenant in carrying out the 2010 Merger." *Id.* at 425.

As this discussion shows, the analysis in *Gerber* turned on the Conclusive Presumption Provision. The limited partnership agreement of Enterprise Parent did not attempt to anticipate and specify all of the matters that a fairness opinion might need to

32

address, leaving gaps. The Delaware Supreme Court used the implied covenant to fill the gaps in the Conclusive Presumption Provision as it applied to the transactions in question. At least as I understand *Gerber*, the high court's analysis cannot be divorced from the Conclusive Presumption Provision that was at issue.

### c. The Scope Of The Fairness Opinion In This Case

If *Gerber* stands for the proposition that a limited partner states a viable implied covenant claim whenever a Conflicts Committee obtains and relies on a fairness opinion that does not consider all elements of the consideration from the standpoint of the limited partners, then this court must deny the defendants' motion for summary judgment on the implied covenant claim. The evidence for purposes of the motion for summary judgment supports the contention that Tudor excluded from its analysis the dilution that the limited partners would suffer, which was a critical element of the transaction from the limited partners' perspective. Tudor's fairness opinion stated: "[W]e express no view or opinion with respect to the amount or level of ownership dilution to the current holders of Common Units as a result of the [Drop-Down]." Transmittal Affidavit of Gerard M. Clodomir dated Nov. 14, 2013 (the "Clodomir Aff.") Ex. 44 at EPP000003. Tudor's Rule 30(b)(6) witness testified that this language meant what it says:

> It was speaking to the fact that—and again, this was more broadly in our opinion language—that a unitholder or shareholder in a transaction—prior to the transaction may own X percent of the company and post-transaction, Y percent and that—that our fairness analysis doesn't directly address that point.
>
> It is not saying we're not focused on accretion/dilution to cash flows. It is strictly looking at that ownership dilution.

33

Simmons Tr. 197-98. The defendants have offered competing evidence, but given the summary judgment standard, this decision assumes for purposes of analysis that Tudor's fairness opinion did not take the possibility of excessive dilution into account.

The plaintiffs have introduced evidence sufficient to support an inference at the summary judgment stage that when opining on the fairness of the Drop-Down to the limited partners, Tudor should have considered the effects of dilution. Although IDRs provide an incentive to acquire assets to grow LP distributions, they also give the General Partner an incentive to use common units to fund the acquisitions. A Tudor analyst report on the midstream MLP sector, issued four months after the Drop-Down was approved, explained that IDRs "can incentivize the general partner to overfund projects with equity financing." Affidavit of Jessica Zeldin dated Dec. 10, 2013 (the "Zeldin Aff.") Ex. 59 at EL007493. This incentive exists because once the Partnership is in the high splits, the General Partner will receive 50% of the incremental cash flows from its IDRs and general partner interest, while the limited partners suffer the dilution from the issuance of additional common units. In the words of the Tudor report, the positive incentive to grow cash flows "can serve as a negative incentive from the LP unitholders' perspective, who can be diluted by unit issuances which increase GP cash flows." *Id.*

The plaintiffs observe that by February 24, 2011, two weeks after El Paso Parent proposed the Drop-Down and less than a week before the Conflicts Committee approved it, El Paso MLP's quarterly distributions crossed into the high splits. Tudor's own models indicate that both in dollar terms and on a percentage basis, El Paso Parent's share of El Paso MLP's cash flows would increase dramatically as a result of reaching

34

the high splits. In dollar terms, before the Drop-Down, the IDRs generated $8 million in distributions in 2010. The plaintiffs' expert, using Tudor's model and inputs, projected that after the Drop-Down, the IDRs would generate an additional $4 million in distributions in 2011, and that figure would grow to $16 million by 2015. On a percentage basis, the growth in distributions received by El Paso Parent would far outstrip the growth in distributions to the limited partners. A slide from Tudor's February 24, 2011 presentation to the Conflicts Committee titled "GP & IDR Accretion," projected that from 2011 to 2015, the Drop-Down would result in 2-3% annual growth of the distributions to the limited partners and 19-24% annual growth of the distributions to the General Partner. The IDRs actually received $49 million in distributions in 2011, well in excess of the projections.

The plaintiffs observe that the differential allocation of cash flows changed the effective pricing of the Drop-Down when viewed as a multiple of EBITDA, a standard valuation metric. Because a sizable portion of the EBITDA generated by the Drop-Down would flow back to El Paso Parent through the IDRs, the effective EBITDA multiple paid by El Paso MLP was higher than if the multiple were calculated without considering the differential allocation of cash flows. The plaintiffs cite an internal analysis that El Paso Parent prepared in January 2010, before proposing the Drop-Down. When the Drop-Down was analyzed without giving effect to the differential allocation of cash flows, the analysis shows that the price paid by El Paso MLP and received by El Paso Parent would be the same and imply an EBITDA multiple of 9.2x. But when the transaction was evaluated solely from the standpoint of the EBITDA available to the limited partners, *i.e.*

subtracting the cash that would flow back to the General Partner, the adjusted EBITDA multiple at which the asset was purchased increased to 10.6x. The adjusted EBITDA multiple at which the asset was sold increased to 11.1x when the transaction was evaluated solely from the standpoint of El Paso Parent. In an accompanying explanation for the board of directors of El Paso Parent, management explained the effect as follows:

> We are proposing the sale of the interests in SNG using the same equivalent multiple agreed to in the June 2010 and November 2010 drop downs of interests in SNG (9.2x multiple of enterprise value to EBITDA). We are asking for approval at this level as we believe that it constitutes appropriate value for the quality of assets offered (given the quality of the cash flow stream and organic growth profile). Comparable transactions, including previous drop downs, have been executed between a range of 8-10x multiple. *We are cognizant that the financial benefit of this drop to El Paso is higher than the nameplate multiple on this deal. Due to El Paso's continued significant ownership interest in EPB, El Paso participates in EPB's accretion through its existing limited partner units and also through its incentive distribution rights. Therefore the net impact to El Paso of the contribution is closer to an 11.1x multiple.*

Zeldin Aff. Ex. 55 at EL130894 (emphasis added).

In September 2011, after the market reacted poorly to the Drop-Down, Tudor performed a similar analysis at the request of the Conflicts Committee. Starting with the "nameplate" 9.2x EBITDA multiple, Tudor adjusted what El Paso Parent sold to reflect the incremental cash flow to the General Partner from the 2% GP interest and the IDRs ($209 million) and the value of incremental cash flow to the General Partner's common units ($73 million), resulting in an effective EBITDA multiple of 12.1x.

The plaintiffs contend that Tudor knew when rendering its fairness opinion how to perform the type of analysis that El Paso Parent conducted internally before proposing

the Drop-Down and that Tudor actually prepared months after the Drop-Down. The plaintiffs argue that if Tudor had conducted such an analysis, it could not have opined that the Drop-Down was fair to the limited partners. From the plaintiffs' perspective, by failing to consider these aspects of the transaction, the Tudor fairness opinion "did not value the consideration that the LP unitholders actually received." *Gerber*, 67 A.3d at 422. As previously noted, if the plaintiffs are correct that *Gerber* stands for the proposition that a limited partner states a viable implied covenant claim whenever a Conflicts Committee obtains a fairness opinion that does not consider all elements of the consideration from the standpoint of the limited partners, then summary judgment on the implied covenant claim should be denied.

### d. *Gerber* Does Not Govern This Case.

In my view, the plaintiffs cannot rely on *Gerber* to state an implied covenant claim in the current case. As I read *Gerber*, that decision turned on the Conclusive Presumption Provision and its gaps. Although the LP Agreement contains a section identical to the Conclusive Presumption Provision, this decision does not rely on it. This decision instead rests on the terms for Special Approval. Consequently, rather than unreflectively expanding *Gerber* beyond the Conclusive Presumption Provision, this court must conduct an implied covenant analysis that focuses on the Special Approval provision. This is, of course, the interpretation of one trial judge, and it may not accurately reflect the Delaware Supreme Court's view of *Gerber*.

As noted, the implied covenant analysis begins with contract construction, which is the phase when the court determines whether the express language of the agreement

37

addresses the issue presented. In this case, the implied covenant analysis need not continue beyond this initial phase. Section 7.9(a) is controlling, leaving no fairness-opinion-related gap to fill.

Section 7.9(a) plainly applies to the Drop-Down. The express language of Section 7.9(a) authorizes the General Partner to proceed with a conflict-of-interest transaction by obtaining Special Approval. To meet the Special Approval requirement, the Conflicts Committee must believe in good faith that the transaction is in the best interests of the Partnership. To hold such a belief, the Conflicts Committee need not have retained a financial advisor or obtained a fairness opinion. Nor must the Conflicts Committee reach a determination about the fairness of the transaction to the limited partners. When evaluating what is in the best interests of the Partnership, the members of the Conflicts Committee can consider and balance all of the various interests of the Partnership, not just the interests of the limited partners. Under the LP Agreement, the standard of review for evaluating the Conflicts Committee's decision is a deferential subjective good faith standard.

It would, in my view, conflict fundamentally with the plain language and structure of Section 7.9(a) to invoke the implied covenant to require that the Conflicts Committee follow a particular course by obtaining an opinion from a financial advisor that addressed the fairness of the Drop-Down to the limited partners in a judicially proscribed manner. Deploying the implied covenant in this fashion would rewrite Section 7.9(a) by changing both the nature of the Conflicts Committee's inquiry (from best interests of the Partnership to fairness to the limited partners) and the scope of judicial review (from the

38

subjective good faith of a majority of the committee to compliance with an obligation to obtain an opinion that analyzed fairness with a sufficient level of methodological rigor to satisfy a court after the fact). Rather than filling a gap, this application of the covenant would alter the terms of the LP Agreement. The implied covenant cannot do that.

Assuming for the sake of argument that the analysis proceeded to the next stage and the court considered what the parties would have agreed to in a hypothetical original bargaining position, the outcome is the same. The prospectus from El Paso MLP's initial public offering in November 2007 provides helpful context regarding what the sponsor contemplated in the original bargaining position and what the public unitholders accepted by purchasing through the IPO. The prospectus disclosed that El Paso MLP anticipated entering into numerous relationships with El Paso Parent that could give rise to conflicts of interests. One obvious relationship was that "[a]ll of [El Paso MLP's] executive management personnel will be employees of our general partner or another subsidiary of El Paso [Parent]," and that "[w]e will also utilize a significant number of employees of El Paso [Parent] to operate our business and provide us with general and administrative services." Clodomir Aff. Ex. 2 at 130. The prospectus also listed a series of significant agreements between El Paso MLP and the entities in which it owned interests, on the one hand, and El Paso Parent, the General Partner, and their affiliates, on the other hand. *See id.* at 140-45.

The prospectus disclosed that El Paso MLP anticipated acquiring properties from El Paso Parent. The prospectus stated that one of the four components of El Paso MLP's business strategy would be "[g]*rowing our business through strategic asset acquisitions*

39

*from third parties, El Paso or both*." *Id.* at 101. The prospectus explained that "[i]n addition to making acquisitions from third parties, we may also have additional opportunities to . . . acquire assets or partial interests in assets directly from El Paso [Parent], although we cannot predict whether any such opportunities will be made available to us and El Paso [Parent] is under no obligation to offer us such opportunities." *Id.* at 101-02. The prospectus noted that as of September 30, 2007, "El Paso [Parent] owned or had interests in approximately 43,000 miles of interstate pipeline and 233 Bcf of working natural gas storage capacity that connect many of the major domestic natural gas producing basins to the major domestic consuming markets." *Id.* at 98. These were the types of assets that El Paso MLP planned to pursue. The prospectus also noted that because of significant net operating loss carry forwards, El Paso Parent would have "increased flexibility with respect to asset selection for future transfers to us" and would have "the ability to offer assets to us in the future without incurring substantial cash taxes on the transfer." *Id.* at 103. The prospectus warned that actions taken by the General Partner "may affect the amount of cash available to pay distributions to unitholders." *Id.* at 146. The prospectus also explained that the amount of cash available would be affected by, among other things, the "amount and timing of asset purchases and sales" and the "issuance of additional units." *Id.*

To address El Paso MLP's expansive web of interrelationships with El Paso Parent, the drafters of the LP Agreement plainly sought to create a method for resolving the numerous and readily foreseeable conflicts of interest that would minimize the potential for litigation and after-the-fact judicial review. Section 7.9(a) provides four

40

methods of resolution, including the option of Special Approval. As noted, Special Approval requires only that the members of the Conflicts Committee believe subjectively in good faith that the transaction is in the best interests of the Partnership. The Special Approval structure seeks to channel conflict-of-interest decisions to the Conflicts Committee for an up-or-down decision that can be reviewed only for subjective good faith, thereby minimizing the potential for litigation. An entity can have a legitimate interest in internal dispute resolution mechanisms designed to avoid litigation. *See ATP Tour, Inc. v. Deutscher Tennis Bund*, --- A.3d ---, 2014 WL 1847446, at \*4 (Del. Ch. May 8, 2014) ("The intent to deter litigation, however, is not invariably an improper purpose.").

Assuming that a question had been raised in the original bargaining position as to whether limited partners should have the ability to challenge the Special Approval process by litigating whether the Conflicts Committee obtained a fairness opinion that satisfied a test of reasonableness, met certain requirements, or otherwise complied with some form of objective standard, the LP Agreement provisions and the discovery record suggest that the parties would have rejected such an approach. In light of the pervasive nature of the conflicts of interest presented by El Paso MLP's governance structure, an approach that incorporated objective standards for judicial review would have made litigation against the General Partner and its affiliates inevitable, frequent, and risky for the defendants. The drafters of the LP Agreement chose a framework that maximized the General Partner's freedom and minimized the opportunities for litigation and judicial oversight. They generally deployed the contractual freedom provided by the Delaware

41

Limited Partnership Act to expand the General Partner's discretion and carve back on protections that otherwise would exist under the common law. Most notably, the drafters of the LP Agreement eliminated all fiduciary duties, resulting in a fully contractual relationship. The drafters then crafted contractual standards for conflict-of-interest transactions in Section 7.9(a) that included the option of Special Approval. Within the Special Approval path, they eschewed any type of objective review of the Conflicts Committee's decisions in favor of a purely subjective test. Taken together, these factors lead to the conclusion that if the issue had been raised in a hypothetical original bargaining position, the parties would not have agreed to incorporate in the Special Approval process a requirement that the Conflicts Committee obtain a fairness opinion that would be subject to judicial review for the sufficiency of its contents and analytical rigor.

When the General Partner chose to proceed with the Drop-Down by means of Special Approval, the sole inquiry became the actual, subjective good faith of the members of the Conflicts Committee. The scope and details of the fairness opinion and Tudor's analysis were fair game for the plaintiffs to use in an effort to support an inference of bad faith, but there is not room in the subjective good faith standard to read into the Special Approval provision a requirement that the Conflicts Committee obtain a fairness opinion that addressed the dilution to be suffered by the limited partners. On this basis, judgment is entered in favor of the General Partner on the implied covenant claim.

**B.      Aiding And Abetting**

In Counts III and IV, the plaintiffs assert claims for aiding and abetting a breach of contract against defendants other than the General Partner.  Count III asserts the claim directly; Count IV asserts it derivatively.  Delaware law generally does not recognize a claim for aiding and abetting a breach of contract.  *See Gotham P'rs*, 817 A.2d at 172. "Limited partnership agreements are a type of contract."  *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013).

Because the alternative entity statutes permit the entity's governing agreement to modify, alter, or expand fiduciary duties, there are situations involving alternative entities where a party could owe fiduciary duties, the scope of the fiduciary duty would be established by contract, and a third party could aid and abet a breach of the contractually measured fiduciary duty.  One example is where the entity agreement restricts or limits fiduciary duties, or supplies a contractual standard for measuring compliance, but does not fully eliminate fiduciary duties.[3]  Another example might be if the entity agreement

---

[3] *Id.* at 172-73; *see In re Atlas Energy Res., LLC*, 2010 WL 4273122, at *9 (Del. Ch. Oct. 28, 2010) (noting that although LLC agreement did not eliminate fiduciary duties of controlling member, it could have "contractually define[d] the standard under which a merger between [the controlling member] and [the LLC] should be assessed"); *Flight Options Int'l, Inc. v. Flight Options LLC*, 2005 WL 6799224, at *7-8 (Del. Ch. July 11, 2005) (holding that contractual standard requiring that interested transactions "be on arms' length terms and conditions, including fair market values" established standard for measuring fiduciary duties owed by controlling member); *Gelfman v. Weeden Investors, L.P.*, 792 A.2d 977, 987, 992 n.24  (Del. Ch. 2001) (interpreting limited partnership agreement that did not eliminate fiduciary duties but rather supplied a contractual standard for measuring compliance); *Fitzgerald v. Cantor*, 1999 WL 182573, at *1 (Del. Ch. Mar. 25, 1999) (addressing a claim for aiding and abetting a "breach of a fiduciary duty created by a contract"); *see also Gatz Props., LLC v. Auriga Capital Corp.*, 59 A.3d 1206, 1214, 1216 (Del. 2012) (holding that LLC agreement imposed "contractually adopted fiduciary duties" and finding a breach of controller's "contracted-for fiduciary duty").

expands fiduciary duties beyond what the common law would impose.[4]  A third example might be an agreement that selects a different fiduciary metric than otherwise would apply, such as by specifying that the conduct of a fiduciary of a Delaware entity would be judged by the law of a different jurisdiction or the principles that would govern a different type of entity.[5]  The Delaware Supreme Court has referred to these hybrid situations as involving "contractual fiduciary duties" and confirmed that, under these circumstances, a party can aid and abet a breach of the contractually measured fiduciary duty.  *Gotham P'rs*, 817 A.2d at 172-73, 178; *accord Gerber*, 67 A.3d at 425-26.

But the Delaware Limited Partnership Act, like Delaware's other alternative entity statutes, authorizes limited partnership agreements to eliminate completely all common law duties, including fiduciary duties, that otherwise would exist.  6 *Del. C.* § 17-1101(d). The public policy expressed in the Delaware Limited Partnership Act is "to give maximum effect to the principle of freedom of contract and to the enforceability of partnership agreements."  *Id.* § 17-1101(c).  A provision of a limited partnership agreement might turn on a particular state of mind, but the inclusion of requisite mental

---

[4] 6 *Del. C.* § 17-1101(d).  While theoretically possible, scholars have yet to find a real-world example of a publicly traded alternative entity agreement that expands fiduciary duties. *See generally* Brent J. Horton, *The Going-Private Freeze-Out:  A Unique Danger for Investors in Delaware Non-Corporate Business Associations*, 38 Del. J. Corp. L. 53 (2013); Mohsen Manesh, *Contractual Freedom Under Delaware Alternative Entity Law:  Evidence from Publicly Traded LPs and LLCs*, 37 J. Corp. L. 555 (2012).

[5] *See, e.g.*, *In re Seneca Invs. LLC*, 970 A.2d 259, 261 (Del. Ch. 2008) (interpreting LLC operating agreement where parties agreed contractually that the entity would be governed as if it were a Delaware corporation); *Douzinas v. Am. Bureau of Shipping, Inc.*, 888 A.2d 1146, 1148 (Del. Ch. 2006) (interpreting operating agreement of Delaware LLC where parties agreed that agreement would be governed by Texas law).

state for compliance with a provision is not the same as creating a fiduciary relationship or re-introducing fiduciary duties that have been eliminated.[6] When parties establish a purely contractual relationship, they have chosen to limit themselves to pursuing contractual remedies against their contractual counterparties. Under those circumstances, a claim for aiding and abetting cannot be used to expand the possible range of defendants. *Gerber v. EPE Hldgs., LLC*, 2013 WL 209658, at \*11 (Del. Ch. Jan. 18, 2013) (holding that defendants could not aid and abet a breach of a limited partnership agreement where the agreement eliminated fiduciary duties).

In this case, the LP Agreement eliminates all fiduciary duties and replaces them with contractual obligations. The LP Agreement requires that the Conflicts Committee believe in good faith that proceeding with a conflict-of-interest transaction is in the best interests of the Partnership. Because the LP Agreement establishes a purely contractual relationship, a theory of aiding and abetting a breach of contract is unavailable in this case. Judgment is entered in favor of all defendants named in Counts III and IV.

### III. CONCLUSION

The defendants' motion for summary judgment is granted.

---

[6] *See, e.g.*, *DV Realty Advisors LLC v. Policemen's Annuity & Benefit Fund of Chi.*, 75 A.3d 101, 109 (Del. 2013) (distinguishing between a contractually required mental state and the different concepts of good faith incorporated in the implied covenant of good faith and fair dealing and in the fiduciary duty of loyalty); *Encore Energy*, 72 A.3d at 106 (declining to use either corporate or tort law principles to give meaning to contractual duty of subjective good faith); *Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 746-48 (Del. Ch. 2008) (applying provision in third-party merger agreement that imposed a cap on damages except for a "knowing and intentional breach" and declining to use corporate or tort law principles to give meaning to the contractual term).