# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE CVR REFINING, LP | ) | CONSOLIDATED |
| UNITHOLDER LITIGATION | ) | C.A. No. 2019-0062-KSJM |

## MEMORANDUM OPINION

Date Submitted: July 30, 2019
Date Decided: January 31, 2020

Joel Friedlander, Jeffrey M. Gorris, Christopher P. Quinn, FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware; Mark Lebovitch, Adam Wierzbowski, David Wales, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; Lawrence Deutsch, Michael Dell'Angelo, BERGER MONTAGUE PC, Philadelphia, Pennsylvania; *Counsel for Plaintiffs.*

Srinivas M. Raju, Matthew W. Murphy, Nicole M. Henry, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Herbert Beigel, LAW OFFICES OF HERBERT BEIGEL, Tucson, Arizona; *Counsel for Defendants CVR Refining, LP, CVR Energy, Inc., CVR Refining Holdings, LLC, CVR Refining GP, LLC, Icahn Enterprises, L.P., Carl C. Icahn, Sunghwan Cho, Jonathan Frates, David L. Lamp, Andrew Langham, Louis J. Pastor, Kenneth Shea, Jon R. Whitney, and Glenn R. Zander.*

**McCORMICK, V.C.**

The plaintiffs allege that entities controlled by Carl Icahn engaged in a multi-step scheme culminating in the exercise of a call right to buy out the minority unitholders of CVR Refining, L.P. (the "Partnership") at an unfair price. According to the plaintiffs, the idea for this scheme came from a similar buyout at an unrelated entity, Boardwalk Pipeline Partners, L.P. ("Boardwalk"). Just prior to the events relevant to this litigation, Boardwalk's general partner exercised a call right that was subject to a trailing-market-based exercise price. After Boardwalk's general partner announced that it was "seriously considering" exercising the call right, it waited as Boardwalk's unit price fell by over 16%, then exercised the call right at the lower price. Analysts criticized the Boardwalk process as designed to lower the market price of the public units prior to exercise, thus lowering the cost of the buyout and conferring a windfall to the option holder.

The plaintiffs alleged that the events at Boardwalk created a playbook for the Icahn entities. To implement a similar scheme at the Partnership, the Icahn entities first needed to increase their collective equity stake to achieve the contractually designated threshold for exercising the call right. Therefore, in May 2018, defendant CVR Energy, Inc. ("CVR Energy") launched a partial exchange offer at $27.63 per common unit. The board of directors of the general partner, comprising persons closely affiliated with Icahn, determined not to make a recommendation concerning

1

the exchange offer and publicly disclosed their non-recommendation. After the exchange offer closed, Icahn entities controlled over 84.5% of the Partnership.

In public filings made contemporaneously with the launch of the exchange offer, Icahn entities disclaimed any intention to exercise the call right after consummating the exchange offer. Nevertheless, analysts publicly speculated that the entities would do so. This speculation drove down the price of the Partnership's common units. As analysts predicted, CVR Energy ultimately announced that it was "contemplating" exercising the call right. CVR Energy then waited as the Partnership's unit price plummeted before exercising the call right at $10.50 per unit. If the call right had been exercised at the exchange offer price, CVR Energy would have paid an additional $393 million.

In their complaint, the plaintiffs claim that the exchange offer was the beginning of a multi-step scheme designed to lower the cost of the buyout. They allege that aspects of this scheme would constitute breaches of an express provision of the partnership agreement requiring that the general partner act in good faith. They further claim that the defendants breached an implied covenant in the call right, which prohibited the defendants from manipulating the trading price of the Partnership's units to subvert the price protections in the call right. To reach the defendants who were not parties to the partnership agreement, the plaintiffs claim that those defendants tortiously interfered with the plaintiffs' contractual rights.

The defendants have moved to dismiss the complaint. Because the partnership agreement at issue eliminates all fiduciary duties owed by the defendants, the primary question before this Court is whether the defendants' alleged scheme, if proven as true, breaches any express or implied provision of the partnership agreement. This decision dismisses certain claims as to certain defendants but otherwise denies the motion. The complaint alleges a reasonably conceivable basis from which the Court can infer that the general partner's non-recommendation breached the partnership agreement's express requirement that the general partner act in good faith. The complaint also alleges that the general partner breached the implied covenant in connection with the call right, and that certain defendants tortiously interfered with the plaintiffs' contractual rights.

Adding a wrinkle to the scheme, a contractual price protection required that the call right exercise price be no less than any amount paid by an affiliate of the general partner in the 90 days preceding the call right. The plaintiffs allege that an executive vice president of the general partner, who purchased limited partnership units within the 90-day window for $16.7162, was an affiliate whose purchase triggered the price protection. This decision additionally holds that it is reasonably conceivable that defendants breached the partnership agreement by not setting the exercise price at the price paid by the vice president.

# I. FACTUAL BACKGROUND

When consolidating six separate actions,[1] the Court deemed the Verified Class Action Complaint filed in C.A. No. 2019-0210 as the operative complaint (the "Complaint").[2] The background facts are drawn from the Complaint, documents it incorporates by reference, and judicially noticeable facts.

## A. The Partnership

Before being involuntarily bought out, the plaintiffs owned common units in the Partnership, a Delaware master limited partnership whose common units were traded on the NYSE under the symbol "CVRR." The Partnership was in the business of refining oil and marketing transportation fuels. CVR Refining GP, LLC is the general partner (the "General Partner") of the Partnership. CVR Energy is the General Partner's indirect parent, and its stock trades on the NYSE under the symbol "CVI." Icahn Enterprises, L.P. ("Icahn Enterprises") controls the General Partner through its 82% interest in CVR Energy.

---

[1] C.A. No. 2019-0062-KSJM Docket ("Dkt.") 47, Order Appointing a Leadership Structure ¶ 4.

[2] C.A. No. 2019-0210-KSJM Dkt. 1, Verified Class Action Compl. ("Compl.").

The following diagram depicts the relationships between these entities:



During time periods relevant to this litigation, Icahn and eight of his current and former business associates comprised the Board of Directors of the General

Partner (the "Board" or "Individual Defendants").[3]  The following table summarizes

the affiliations of the directors other than Icahn with Icahn-controlled entities.

| DIRECTOR | AFFILIATION |
|---|---|
| SungHwan Cho | Director of General Partner and CVR Energy.  CFO of Icahn Enterprises.  Former board member of other CVR entities and Icahn-controlled companies. |
| Jonathan Frates | Director of General Partner.  Portfolio Company Associate at Icahn Enterprises.  Former board member of other CVR entities and Icahn-controlled companies. |
| David L. Lamp | Director of General Partner and CVR Energy.  President and CEO of General Partner and CVR Energy.  Board member of other CVR entities. |
| Andrew Langham | Director of General Partner.  General Counsel of Icahn Enterprises.  Board member of other CVR entities.  Former board member of CVR Energy and other Icahn-controlled companies. |
| Louis J. Pastor | Director of General Partner and CVR Energy.  Former Deputy General Counsel of Icahn Enterprises.  Current and former board member of Icahn-controlled companies. |
| Kenneth Shea | Director of General Partner.  Managing Director at Icahn Capital LP, a wholly owned subsidiary of Icahn Enterprises. |
| Glenn Zander | Former Director of General Partner (until July 2018) and CVR Energy.  Former Icahn-designated board member at other public companies. |
| Jon R. Whitney | Director of General Partner.  Former board member of other CVR entities. |

Icahn was Chairman of both the General Partner and CVR Energy until

July 2018, when he resigned from those positions.  He publicly disclosed that he

---

[3] Defendants represent that the Board of the General Partner doubled as the board of directors of the Partnership.  C.A. No. 2019-0062-KSJM Dkt. 53, Opening Br. in Supp. of Defs.' Mot. to Dismiss ("Defs.' Opening Br.") at 10.

6

resigned from those positions "due to his extremely busy schedule," but the plaintiffs allege that he resigned to distance himself from an ongoing call right exercise scheme.[4]

The Partnership is governed by the First Amended and Restated Agreement of Limited Partnership of CVR Refining, LP (the "Partnership Agreement"). The Partnership Agreement eliminates traditional fiduciary duties and imposes contractual duties.[5]

Section 7.9 of the Partnership Agreement imposes two contractual standards of conduct on the General Partner, one when the General Partner is acting in its official capacity as the general partner of the Partnership, and the other when the General Partner is acting solely in its individual capacity.

Section 7.9(a) of the Partnership Agreement provides that when acting in its official capacity as the general partner of the Partnership, the General Partner "shall not make such determination, or take or omit to take such action, in Bad Faith."[6] "Bad Faith" is defined as "the belief that such determination, action or omission was adverse to the interest of the Partnership."[7] "Good Faith" is defined as "not taken in

---

[4] Compl. ¶¶ 22, 93.

[5] *See* P'ship Agreement § 7.2.

[6] *Id.* § 7.9(a).

[7] *Id.* § 1.1.

Bad Faith."[8] "In any proceeding brought by or on behalf of the Partnership, . . . the Person bringing or prosecuting such proceeding shall have the burden of proving that such determination, action or omission was not in Good Faith."[9]

Section 7.9(b) of the Partnership Agreement provides that when *not* acting in its capacity as the general partner of the Partnership, the General Partner is "entitled, to the fullest extent permitted by law, to make such determination or to take or omit to take such action free of any fiduciary duty or duty of Good Faith."[10] Section 7.9(c) further specifies that when acting in its contractually delegated "sole discretion," the General Partner is "acting in its individual capacity" and not "acting in its capacity as the general partner of the Partnership."[11]

The Partnership Agreement does not impose a separate standard of conduct for conflict transactions,[12] although Section 7.9(d) provides optional safe harbors

---

[8] *Id.*

[9] *Id.* § 7.9(a).

[10] *Id.* § 7.9(b).

[11] *Id.* § 7.9(c).

[12] *Compare id.* § 7.9(d) (providing that "the General Partner may in its discretion submit any resolution, course of action with respect to or causing such conflict of interest or transaction (i) for Special Approval or (ii) for approval by the vote of a majority of the Common Units (excluding Common Units owned by the General Partner and its Affiliates"), *with Bandera Master Fund LP v. Boardwalk Pipeline P'rs, LP*, 2019 WL 4927053, at *11 (Del. Ch. Oct. 7, 2019) (partnership agreement providing that "the General Partner or its Affiliates in respect of such conflict of interest shall be permitted and deemed approved by all Partners, and shall not constitute a breach of this Agreement . . . or of any duty stated or implied by law or equity, if the resolution or course of action in respect of such conflict of interest is (i) approved by Special Approval, (ii) approved by

8

that the General Partner may apply in its discretion.  The General Partner did not invoke Section 7.9(d) in connection with the events giving rise to this litigation.

## B.    The Call Right

Section 15.1(a) of the Partnership Agreement grants the General Partner or its assignee the right to purchase common units held by unaffiliated limited partners (the "Call Right"):

> Notwithstanding any other provision of this Agreement, if at any time the General Partner and its Affiliates hold more than 95% of the total Limited Partner Interests of any class then Outstanding, the General Partner shall then have the right, which right it may assign and transfer in whole or in part to the Partnership or any Affiliate of the General Partner, exercisable in its sole discretion, to purchase all, but not less than all, of such Limited Partner Interests of such class then Outstanding held by Persons other than the General Partner and its Affiliates, at the greater of (x) the Current Market Price as of the date three days prior to the date that the notice described in Section 15.1(b) is mailed or (y) the highest price paid by the General Partner or any of its Affiliates for any such Limited Partner Interest of such class purchased during the 90-day period preceding the date that the notice described in Section 15.1(b) is mailed. Notwithstanding the foregoing, if, at any time, the General Partner and its Affiliates hold less than 70% of the total Limited Partner Interests of any class then Outstanding then, from and after that time, the General Partner's right set forth in this Section 15.1(a) shall be

---

the vote of a majority of the Common Units (excluding Common Units owned by the General Partner and its Affiliates), (iii) on terms no less favorable to the Partnership than those generally being provided to or available from unrelated third parties or (iv) fair and reasonable to the Partnership, taking into account the totality of the relationships between the parties involved (including other transactions that may be particularly favorable or advantageous to the Partnership)").

9

exercisable if the General Partner and its Affiliates subsequently hold more than 80% of the total Limited Partner Interests of such class.[13]

Section 15.1(a) thus has two conditions, one of which must be met before the General Partner can exercise the Call Right. One condition is satisfied when the General Partner and its Affiliates hold more than 95% of a class of units. The other condition is satisfied when the General Partner and its Affiliates increase their holdings from "less than 70% of the total Limited Partner Interests" to "more than 80% of the total Limited Partner Interests."[14]

The Call Right provides limited partners with two price-setting provisions.[15] The 90-day provision (the "90-day Provision") prevents minority unitholders from having their units called at a price below what the General Partner or its Affiliates paid to purchase any units within the preceding 90 days of the date of exercise.[16] The 20-day provision (the "20-day Formula") calls for the price to be "the average

---

[13] P'ship Agreement § 15.1(a).

[14] *Id.*

[15] *Id.* (explaining the exercise price shall be "the greater of (x) the Current Market Price as of the date three days prior to the date that the notice . . . is mailed or (y) the highest price paid by the General Partner or any of its Affiliates for any such Limited Partner Interest of such class purchased during the 90-day period preceding the date that the notice . . . is mailed); *id.* § 1.1 (definition of "Current Market Price").

[16] *Id.* § 15.1(a).

10

of the daily Closing Prices per Partnership Interest of such class for the 20 consecutive Trading Days immediately prior to such date."[17]

## C. The Scheme

As discussed at the outset of this decision, the plaintiffs posit the existence of a "Boardwalk playbook" that sets out "how the controller of an MLP could weaponize a call right with a trailing-market-price-based buyout price by artificially manipulating the stock price."[18] They say that sophisticated investors and investment banking analysts observed the Boardwalk scheme as it played out in April and May of 2018 and published commentary predicting the outcome in real time.

During the same month that analysts were publicly criticizing the Boardwalk call right process, the plaintiffs allege that the defendants conceived of a similar "multi-step plan to buy out the Partnership's public unitholders on the cheap."[19] According to the plaintiffs, the steps went as follows:

> *First*, propose a partial exchange offer to the Board.
>
> *Second*, launch a partial exchange offer to acquire sufficient Partnership common units to satisfy the Call Trigger.

---

[17] *Id.* § 1.1.

[18] Dkt. 55, Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss ("Pls.' Ans. Br.") at 12; *see id.* at 12–13 (discussing required steps taken to carry out scheme).

[19] Compl. ¶ 58.

11

*Third*, wait for the 90-day price protection period of Section 15.1(a) to expire and conceal or disclaim any intent to exercise the Call Right during that period.

*Fourth*, announce that it was considering exercising the Call Right, which would prompt the trading price to drop.

*Fifth*, exercise the Call Right at an artificially low price.[20]

### 1.     CVR Energy Proposes the Exchange Offer.

On April 30, 2018, Boardwalk's controller had announced that it was "seriously considering" exercising the call right.[21]   On May 10, 2018, Barclays issued a report titled "Digging deeper into call rights," which analyzed the call rights for numerous MLPs and criticized Boardwalk's controller for teasing the market.[22] On May 15, 2018, JP Morgan issued an analyst report regarding Boardwalk and noting the "perception of securities manipulation."[23]

Two days later, on May 17, 2018, representatives of CVR Energy and the Partnership met to discuss a partial exchange offer that would position CVR Energy to exercise the call right  (the "Exchange Offer").  At the time, Icahn Enterprises was poised to take advantage of the lower Call Right condition, having lowered its interests in 2016 to below 70%.[24]  The May 17 meeting discussed a partial exchange

---

[20] Pls.' Answering Br. at 12–13.

[21] Compl. ¶ 53.

[22] *Id.* ¶ 56.

[23] *Id.* ¶ 57.

[24] The contemporaneous SEC filings disclosed that the sale "was to reduce the Call Right Trigger percentage by reducing the ownership interests of the General Partner and its

12

offer that would allow CVR Energy to acquire over 80% of Partnership units, thereby satisfying the condition to exercising the Call Right. Because each of the Partnership's executive officers is also an executive officer of CVR Energy, the plaintiffs describe this May 17 "meeting" as a check-the-box exercise of no real consequence. On May 24, 2018, the Board met to discuss the Exchange Offer. At the time, the Board comprised Icahn, four Icahn Enterprises employees (Cho, Frates, Langham, and Pastor), the CEO of CVR Energy (Lamp), two board members with long-term ties to Icahn (Shea and Zander), and Whitney. Despite Icahn's significant ties to the overwhelming majority of the Board, the Board did not refer the decision to a conflicts committee or otherwise invoke any safe harbor provisions of the Partnership Agreement.

Four days later, the Board determined that it would not make a recommendation for or against the Exchange Offer. The Board's official position— reflected in the Schedule 14D-9 it caused the Partnership to file with the SEC—was that it was "expressing no opinion"[25] because the decision to participate in the Exchange Offer was "a personal investment decision dependent upon each individual limited partner's particular investment objectives and circumstances and

---

Affiliates below 70% of the common units." Compl. ¶ 49. After this sale, "the General Partner and its affiliates (including the Reporting Persons . . .) collectively own[ed] 69.99% of the Common Units." *Id.*

[25] *Id.* ¶ 79.

their own consideration and evaluation of all of the Partnership's publicly available information."[26]

### 2. CVR Energy Launches the Exchange Offer.

On May 29, 2018, CVR Energy launched the Exchange Offer at a price of $27.63, which represented a 25% premium to the pre-announcement unit price. The Exchange Offer expired on July 27, 2018. Holders of nearly half of the outstanding minority units tendered, increasing Icahn Enterprises and its affiliates' ownership to approximately 84.5% of the Partnership's units.

### 3. CVR Energy Lets 90 Days Expire While the Market Predicts that CVR Energy Will Exercise the Call Right.

In public filings made contemporaneously with the launch, Icahn Enterprises and CVR Energy disclaimed any intention to exercise the Call Right.[27] Despite these public statements, analysts remained skeptical. Analysts predicted that the prospect of the Icahn-related entities satisfying the Call Right condition "would depress the market price of the common units."[28] On May 29, 2018, Barclays issued a report opining that the results of the Exchange Offer would be an "ongoing overhang for the [Partnership] unitholders."[29] Macquarie Research issued a report the next day

---

[26] *Id.* ¶ 81.

[27] *Id.* ¶ 72.

[28] *Id.* ¶ 84.

[29] *Id.* ¶ 85.

positing that the Exchange Offer was the first step in CVR Energy and its affiliates' plan to exercise the Call Right.

The SEC was also skeptical, inquiring on June 5, 2018 "whether or not this tender offer constitutes the first step in a series of transactions that ultimately could produce one of the two specified going private effects."[30] CVR Energy responded that it "view[ed] the offer as a discrete transaction and not the first step in a series of transactions that may occur in the future."[31]

During the Partnership's July 26, 2018 earnings call, multiple analysts expressed concern regarding the effects of the Exchange Offer.[32] In a July 27, 2018, research report, Barclays noted that positive second quarter 2018 results would have only a "neutral impact" on the price of Partnership units because of the "privatization risk" associated with the Call Right.[33] On August 1, 2018, Macquarie Research published a report noting how the prospect of a potential exercise of the Call Right could "decrease unit holder[s'] ability to capture the long term underlying asset

---

[30] *Id.* ¶ 68.

[31] *Id.*

[32] *Id.* ¶ 87 (alleging that a Goldman Sachs analyst characterized the Exchange Offer as "very unusual" and asked Defendant Lamp about its "strategic rationale" and what it "represents on a go-forward basis"); *id.* ¶ 88 (alleging that an analyst from Tudor, Pickering, Holt & Co. asked Lamp: "If the exchange offer is successful, though, are you worried about how the remaining units of [the Partnership] will trade? You are looking at a stock with potentially a very low float, this call option from [CVR Energy].").

[33] *Id.* ¶ 89 (explaining that the majority unitholder could buy out the minority "without the need to pay any premium above their current share prices").

value."[34]   Also on August 1, 2018, Icahn Enterprises and CVR Energy filed an amended Schedule 13D reiterating that the "Reporting Persons and the Issuer have no current plans to exercise the call right at this time."[35]

On October 24, 2018, the Partnership reported favorable third quarter 2018 results.  According to Barclays, the "existence of the call option by the parent corporation . . . will likely mute the market response" to these positive results because "privatization risk still serves as an overhang to any potential upside."[36] During the Partnership's October 25, 2018 earnings call, CVR Energy's CEO, who served on the Board, again denied that CVR Energy had plans to exercise the Call Right.  The next day, Barclays again noted its pessimism about the price of Partnership units "so long as the . . . call option risk lingers."[37]   Macquarie's contemporaneous analyst report likewise added that the "potential removal of a takeover premium make[s] [the Partnership] a less favorable vehicle."[38] Meanwhile, the price of Partnership units fell while the price of CVR Energy units rose.

---

[34] *Id.* ¶ 92.

[35] *Id.* ¶ 94.

[36] *Id.* ¶ 97.

[37] *Id.* ¶ 101.

[38] *Id.* ¶ 102.

### 4. CVR Energy Publicly Announces That It Might Exercise the Call Right.

Ninety days and one month after closing the Exchange Offer, on November 29, 2018, Icahn Enterprises and CVR Energy filed an amended Schedule 13D disclosing that CVR Energy was "now contemplating" an exercise of the Call Right.[39] The price of Partnership units at that time was approximately $17.16. The trading price of CVR's common units fell precipitously thereafter.

### 5. CVR Energy Exercises the Call Right.

On January 17, 2019, the Call Right price as determined by the 20-day Formula was $10.50 per unit, $17.13 lower than the Exchange Offer price. The Partnership and CVR Energy announced that the General Partner had assigned the Call Right to CVR Energy and that CVR Energy would exercise the Call Right.

### D. An Additional Wrinkle: An Alleged Affiliate Purchases Partnership Units Within 90 Days of the Call Right Exercise.

Recall that the 90-day Provision required the party exercising the Call Right to pay "the highest price paid by the General Partner *or any of its Affiliates* for any such Limited Partner Interest of such class purchased during the 90-day period preceding."[40] On November 14, 2018, Janet T. DeVelasco, the Vice President of Environmental, Health, Safety and Security at CVR Energy and the General Partner,

---

[39] *Id.* ¶ 103.

[40] P'ship Agreement § 15.1(a) (emphasis added).

purchased Partnership units at a price of $16.7162. In addition to serving as an officer of CVR Energy and the General Partner, DeVelasco is featured on the CVR Energy website as a member of CVR Energy and the General Partner's "Executive Team." DeVelasco's promotion to her current role required the Partnership and CVR Energy to file a Form 8-K, an SEC filing required to announce "major events shareholders should know about."[41]

The plaintiffs allege that DeVelasco is an "Affiliate" of the General Partner as defined in Section 1.1 of the Partnership Agreement such that the Call Right price should have been at least $16.7162.

### E. This Litigation

This action consolidated multiple suits filed within the weeks after the CVR Energy's exercise of the Call Right. On April 4, 2019, the Court entered an order appointing co-lead counsel and designating an operative complaint.[42] The Complaint alleges three Counts:

- Count I for breach of the Partnership Agreement against the Partnership, the General Partner, CVR Holdings, and CVR Energy;
- Count II for breach of the implied covenant of good faith and fair dealing embedded in the Partnership Agreement against the Partnership, the General Partner, CVR Holdings, and CVR Energy; and
- Count III for tortious interference with the Partnership Agreement against CVR Energy, Icahn Enterprises, and the Individual Defendants.

---

[41] Compl. ¶ 118.

[42] Dkt. 47, Order Appointing a Leadership Structure.

18

The defendants filed a motion to dismiss on May 31, 2019.[43] The parties fully briefed the motion by July 18, 2019,[44] and the Court heard oral arguments on July 30, 2019.[45]

While the defendants' motion was pending, Vice Chancellor Laster issued his decision on a pending motion to dismiss in the case challenging the exercise of the call right in Boardwalk, *Bandera Master Fund LP v. Boardwalk Pipeline Partners, LP* ("*Boardwalk*").[46] The parties then submitted supplemental briefing on the effect of that decision on the pending motion.[47]

## II.  LEGAL ANALYSIS

The defendants have moved to dismiss the Complaint pursuant to Court of Chancery Rule 12(b)(6).  Under Rule 12(b)(6), the Court may grant a motion to dismiss if the complaint "fail[s] to state a claim upon which relief can be granted."[48] "[T]he governing pleading standard in Delaware to survive a motion to dismiss is

---

[43] Dkt. 52, Defs.' Mot. to Dismiss Verified Class Action Compl.

[44] Defs.' Opening Br.; Pls.' Answering Br.; Dkt. 59, Reply Br. in Further Supp. of Defs.' Mot. to Dismiss ("Defs.' Reply Br.").

[45] Dkt. 62, Oral Arg. on Defs.' Mot. to Dismiss.

[46] 2019 WL 4927053 (Del. Ch. Oct. 7, 2019).

[47] Dkt. 64, Lead Pl.'s Supp. Br.; Dkt. 65, Supp. Submission on the Appl. of the Boardwalk Mem. Op. in Supp. of Defs.' Mot. to Dismiss ("Defs.' Supp. Br.").

[48] Ct. Ch. R. 12(b)(6).

reasonable 'conceivability.'"[49]  When considering such a motion, the Court must "accept all well-pleaded factual allegations in the [c]omplaint as true . . . , draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[50]  The Court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[51]  The defendants seek dismissal of each of the plaintiffs' three Counts.

## A.    Breach of the Partnership Agreement

In Count I, the plaintiffs claim that the Partnership, the General Partner, CVR Holdings, and CVR Energy breached the Partnership Agreement twice: first in connection with the Exchange Offer, and second by setting the exercise price of the Call Right at an amount lower than the price DeVelasco paid.  Count I states a claim upon which relief can be granted.

---

[49] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[50] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[51] *Price v. E.I. du Pont de Nemours Co., Inc.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

Principles of contract interpretation govern this analysis.[52] Delaware law "construe[s] limited partnership agreements in accordance with their terms in order to give effect to the parties' intent."[53] This Court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[54] Words are given "their plain meaning unless it appears that the parties intended a special meaning."[55]

If contractual terms are ambiguous, "the interpreting court must look beyond the language of the contract to ascertain the parties' intentions."[56] But "[a] contract is not ambiguous 'simply because the parties do not agree upon its proper construction,' but only if it is susceptible to two or more reasonable interpretations."[57] At the motion to dismiss stage, "the trial court cannot choose

---

[52] 6 *Del. C.* § 17-1101(c) (noting the Delaware Revised Uniform Limited Partnership Act is intended to give "maximum effect to the principle of freedom of contract and the enforceability of partnership agreements").

[53] *Allen v. Encore Energy P'rs, L.P.*, 72 A. 3d 93, 104 (Del. 2013) (citing *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013)).

[54] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (citing *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014)).

[55] *Encore Energy*, 72 A.3d at 104 (citing *AT&T Corp. v. Lillis*, 953 A.2d 241, 252 (Del. 2008)).

[56] *Eagle Indus., Inc. v DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 n.8 (Del. 1997) (citing *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992)).

[57] *Norton*, 67 A.3d at 354 (quoting *AT&T*, 953 A.2d at 253).

between two differing reasonable interpretations of ambiguous provisions."[58] Dismissal is appropriate on a Rule 12(b)(6) motion "only if the defendants' interpretation is the *only* reasonable construction as a matter of law."[59]

### 1. The Exchange Offer

The defendants argue that dismissal of Count I's challenge to the Exchange Offer is warranted because the Exchange Offer was a "voluntary, unitholder-level" transaction.[60] They note that the Partnership Agreement is "wholly silent and imposes no role or obligation on the General Partner with respect to a tender offer or an exchange offer,"[61] which is technically true. They observe that unlike mergers, tender and exchange offers do not require the involvement or consent of a general partner. From the lack of affirmative contractual obligations specific to an exchange offer, the defendants deduce that no defendant could have breached the Partnership Agreement in connection with the Exchange Offer.

The defendants' argument ignores that the General Partner took action in connection with the Exchange Offer. The Board met to discuss the offer. Shortly thereafter, it determined that the General Partner would not make any

---

[58] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003) (citing *Vanderbilt Income & Growth Assocs. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996)).

[59] *Id.*

[60] Defs.' Reply Br. at 7.

[61] *Id.*

recommendation to unitholders. The General Partner then disclosed its non-recommendation determination as part of Schedule 14D-9 filed on behalf of the Partnership.[62] The focus is thus not whether the General Partner was contractually obligated to act, but rather, whether the actions taken by the General Partner breached the Partnership Agreement.

As discussed above, the Partnership Agreement imposes different contractual standards of conduct on the General Partner depending on whether the General Partner acted in an official capacity. To resolve the current issue, the Court must first determine whether the General Partner acted in its official capacity.

The non-recommendation determination was made in the General Partner's official capacity. A Schedule 14D-9 is an official document that discloses, among other things, a statement of a target company's position concerning a tender offer.[63] Thus, the non-recommendation determination disclosed in the Schedule 14D-9 was the official position of the Partnership concerning the Exchange Offer. The General Partner acted in its official capacity when the Board deliberated and then made the non-recommendation determination.

The disclosure of the non-recommendation determination also constituted an action by the General Partner in its official capacity. Section 7.9(c) of the

---

[62] Compl. ¶¶ 79–80.

[63] 17 C.F.R. § 240.14d-9(g); *see also Morrison v. Berry*, 191 A.3d 268, 272 (Del. 2018).

23

Partnership Agreement provides that the General Partner acts in its official capacity when "the General Partner exercise[es] its authority as a general partner under this Agreement, other than when it is 'acting in its individual capacity.'"[64] For avoidance of doubt, Section 7.9(c) continues to state that "'acting in its individual capacity' means: (A) any action by the General Partners or its Affiliates *other than through the exercise of the General Partner of its authority as a general partner under this Agreement*."[65] Section 7.1(a) then enumerates specific authority possessed by the General Partner, which includes the power to make public filings on behalf of the Partnership.[66] It is therefore reasonably conceivable that by filing the 14D-9 on behalf of the Partnership, the General Partner exercised its authority under the Partnership Agreement and thus acted in an official capacity.

Because the General Partner was acting in an official capacity, the good faith standard of Section 7.9(a) applies to the non-recommendation determination and disclosure. Section 7.9(a) requires the General Partner "not to make such determinations, or take or omit to take such action, in Bad Faith,"[67] with Bad Faith defined as the "belief that such determination, action or omission was adverse to the

---

[64] P'ship Agreement § 7.9(c).

[65] *Id.* (emphasis added).

[66] *Id.* § 7.1(a)(ii) (giving the General Partner power over "the making of . . . regulatory and other filings, or rendering of periodic or other reports to governmental or other agencies having jurisdiction over the business or assets of the Partnership").

[67] P'ship Agreement § 7.9(a).

Partnership."[68] This definition implies a subjective standard.[69] To plead subjective bad faith, a plaintiff must plead facts to show that the defendants subjectively believed that an action was "against the partnership's best interests" or that the defendants "failed intentionally to act in the face of a known duty."[70]

Although "the subjective good faith standard remains distinct from an objective, 'reasonable person' standard," the objective reasonableness of a transaction may weigh in the Court's analysis of whether the defendants subjectively acted in bad faith.[71] "The directors' personal knowledge and experience will be relevant to a subjective good faith determination, which must focus on measuring the directors' approval of a transaction against their knowledge of the facts and circumstances surrounding the transaction."[72] The Delaware Supreme Court has explained that it may be "reasonable to infer subjective bad faith . . . when a plaintiff alleges objective facts indicating that a transaction was not in the best interests of the partnership and that the directors knew of those facts."[73]

---

[68] *Id.* § 1.1.

[69] *See Encore Energy*, 72 A.3d at 104 ("This definition distinguishes between 'reasonably believes' and 'believes' and eschews an objective standard when interpreting the unqualified term 'believes.'"); *Norton*, 67 A.3d at 360.

[70] *Encore Energy*, 72 A.3d at 105.

[71] *Id.* at 107.

[72] *Id.*

[73] *Id.*

When considering whether a transaction is in the "best interests of the partnership," the Court generally takes a holistic approach, considering the effects on the partnership as an entity.[74] This perspective affords a general partner the "discretion to consider the full range of entity constituencies in addition to the limited partners, including but not limited to employees, creditors, suppliers, customers, and the General Partner itself."[75] However, "[a] transaction that is in the best interests of the Partnership logically should not be 'highly unfair to the limited partners,'"[76] particularly where no offsetting benefits to the partnership are apparent.[77]

In this case, it is reasonably conceivable that the Board believed that the Exchange Offer was adverse to the interests of the limited partners with no offsetting benefits, and, thus, adverse to the Partnership as a whole.

It is reasonably conceivable that the Exchange Offer was adverse to the interests of the limited partners because it triggered speculation about the Call Right,

---

[74] *Norton*, 67 A.3d at 367.

[75] *Boardwalk*, 2019 WL 4927053, at *15.

[76] *Dieckman v. Regency GP LP*, 2018 WL 1006558, at *4 (Del. Ch. Feb. 20, 2018) (citing *Allen v. El Paso Pipeline GP Co.*, 113 A.3d 167, 181 (Del. Ch. 2014)).

[77] *See Boardwalk*, 2019 WL 4927053, at *16 (declining to dismiss when it "is not intuitively apparent how the Potential-Exercise Disclosure would have had offsetting positive effects on the Partnership's business, employees, customers, suppliers, or the communities in which it operates"); *see also Norton*, 67 A.3d at 367 (holding that "best interests of the Partnership," which included "the general partner and the limited partners").

26

which "depress[ed] the market price of the common units"[78] and caused an "ongoing overhang for the Partnership unitholders."[79] As discussed above, these effects raised concern among analysts, evidenced by questions during the Partnership's July 2018 earnings call. One analyst asked about the "strategic rationale" for the Exchange Offer.[80] Another analyst expressed apprehension about the Partnership's low float and whether the units would be able to remain in the Alerian MLP index, "the leading gauge of energy Master Limited Partnerships."[81] Yet another analyst reported around the same time period that "given the majority shareholder's right to force the privatization of the remaining shares anytime . . . , without the need to pay any premium above their current share prices, we believe [the Partnership] will remain on the sidelines for any remaining prospective investors."[82] Analysts continued to identify "privatization risk" as an overhang on the trading price even after the Partnership announced positive third quarter 2018 results.[83]

It is also reasonably conceivable that the Exchange Offer was detrimental to the Partnership as a whole. After the Exchange Offer, the trading price for common

---

[78] Compl. ¶ 84.

[79] *Id.* ¶ 85.

[80] *Id.* ¶ 87; *see supra* note 32.

[81] *Id.* ¶ 88.

[82] *Id.* ¶ 89.

[83] *Id.* ¶ 97.

units dropped, increasing the Partnership's cost of equity and, therefore, its cost of capital. The Partnership expressly acknowledged in its annual report that "[t]o the extent we are unable to finance our growth externally, the growth in our business, and our liquidity, may be negatively impacted."[84] An increased cost of equity increases the cost of raising external capital needed to finance growth. Thus, the facts alleged support a reasonably conceivable inference that the Exchange Offer was adverse to the interests of the Partnership as a whole, not just the remaining unaffiliated limited partners.

It is further reasonable to infer that the Board actually knew of these potentially harmful effects when it made and disclosed the non-recommendation determination. Obtaining units sufficient to exercise the Call Right was a condition to the Exchange Offer, as the Board disclosed.[85] Thus, the Board was aware that CVR Energy would be in a position to exercise it after the Exchange Offer. The Board comprised "savvy and sophisticated parties" within the energy MLP sector,[86] and thus it is reasonable to infer that its members were knowledgeable about the highly publicized events at Boardwalk. As discussed above, analysts and the SEC

---

[84] CVR Refining, LP, Annual Report (Form 10-K) (Feb. 19, 2019), at 67; *see In re Kinder Morgan Inc. Corp. Reorganization Litig.*, 2015 WL 4975270, at *8 (Del. Ch. Aug. 20, 2015) (describing concerns related to cost of capital).

[85] Compl. ¶ 69.

[86] Defs.' Reply Br. at 27.

28

similarly saw the writing on the wall, questioned whether the Exchange Offer was the first step in a series of transactions that would lead to a Call Right exercise, and noted their concerns regarding the issue. If non-insiders can deduce the possible detrimental effects posed by the Exchange Offer, it is reasonably conceivable that savvy insiders knew what they were doing when they launched it in the first place.

In sum, the plaintiffs have alleged facts sufficient to show that the Board and the General Partner knew of the risks to the Partnership associated with the Exchange Offer.[87] They nevertheless made and disclosed the non-recommendation determination. These allegations are sufficient to state a breach of contract claim as to the General Partner. They are also sufficient to state a claim against the Partnership, because the General Partner controlled the Partnership and caused it to issue the no-determination disclosure.[88]

---

[87] *Encore Energy*, 72 A.3d at 107.

[88] *See Boardwalk*, 2019 WL 4927053, at \*21 (remarking that "it is not clear the extent to which the Partnership could be liable for breach of its Partnership Agreement if the breach was committed by the General Partner," but reasoning that "it would be premature to dismiss the claim for breach of contract against the Partnership when the Partnership was a party to the operative contract (the Partnership Agreement), when the General Partner controlled the Partnership and caused it to take actions that are challenged in the case (such as the issuance of the disclosure), and where a potential remedy may involve the Partnership"); *see also El Paso Pipeline GP Co. v. Brinckerhoff*, 152 A.3d 1248, 1265 (Del. 2016) (finding claims were derivative in nature when limited partners alleged that general partner breached standard of care and thus entity could not be held liable); *Gerber v. EPE Hldgs., LLC*, 2013 WL 209658, at \*12 (Del. Ch. Jan. 18, 2013) ("Even if [the plaintiff's] claims could be viewed as based on the [agreement], in addition to, or apart from, traditional fiduciary duties, that a claim is based on contract does not necessarily make it a direct claim.").

This aspect of Count I does not state a claim against CVR Holdings in connection with the Exchange Offer. Although CVR Holdings is a party to the Partnership Agreement, CVR Holdings is not the subject of a single allegation in the Complaint.[89] This aspect of Count I also does not state a claim for breach of contract against CVR Energy, which was not a party to the Partnership Agreement at the time of the Exchange Offer and did not become bound by its terms until the General Partner assigned the Call Right in January 2019.[90]

### 2. The Exercise Price

Count I also claims that CVR Energy breached the Partnership Agreement when it exercised the Call Right at a price lower than what DeVelasco paid. The defendants respond that DeVelasco is not actually an Affiliate of the General Partner and that, even if she were, a trust purchased the units.

Under Section 15.1(a) of the Partnership Agreement, the General Partner must exercise the Call Right at the "highest price paid by the General Partner or any of its

---

[89] While it is conceivable that "a party who wishes to have a parent corporation backstop the obligations of its subsidiary can do so by contract . . . by making the parent a party to the agreement," *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at *26 (Del. Ch. Nov. 17, 2014), the plaintiffs do not pursue this theory or otherwise explain how CVR Holdings could be held liable.

[90] *See* P'ship Agreement § 16.3 (providing that the Partnership Agreement "shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives and permitted assigns."); *El Paso Pipeline*, 113 A.3d at 178 ("It is a general principle of contract law that only a party to a contract may be sued for breach of that contract." (citing *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 172 (Del. 2002))).

Affiliates for any such Limited Partner Interest of such class purchased during the 90-day period preceding" the notice of the exercise of the Call Right.[91] The Call Right was exercised on January 17, 2019. The preceding 90 days began on October 19, 2018. DeVelasco purchased units on November 14, 2018, within the relevant timeframe. The only question is whether the plaintiffs have alleged that DeVelasco is an Affiliate of the General Partner.

The Partnership Agreement defines Affiliate as "with respect to any Person, any other Person that directly or indirectly through one or more intermediaries Controls, is Controlled by or is under common Control with, the Person in question."[92] "Control" is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise."[93] The defendants contend that the plaintiffs have not pled a sufficient factual basis for the Court to reasonably infer that DeVelasco is covered by the Affiliate clause.[94]

It is reasonably conceivable that DeVelasco's role as the Vice President of Environmental, Health, Safety and Security at CVR Energy and the General Partner affords her the power to direct management and policies at these entities. DeVelasco

---

[91] P'ship Agreement § 15.1(a).

[92] *Id.* § 1.1.

[93] *Id.*

[94] Defs.' Opening Br. at 38.

31

is held out as an "executive officer" on CVR Energy's website, in press releases, and in SEC filings.[95] Federal regulations define an executive officer as a "president, any vice president of the registrant in charge of a principal business unit, division or function (such as sales, administration or finance), any other officer who performs a policy making function or any other person who performs similar policy making functions for the registrant."[96] The defendants argue that under the Partnership Agreement, an Affiliate "must have the *actual* 'power to direct or cause the direction of the *management and policies*.'"[97] But the word "actual" does not appear in the Partnership Agreement, and the Court will not read in superfluous language.

The defendants' proposed interpretation is arguably belied by their own treatment of DeVelasco in prior SEC filings related to the Call Right. In August 2016, when Icahn Enterprises sold enough units to take advantage of the lower Call Right condition, it announced that the total holdings of "the General Partner *and its affiliates*" had been lowered to 69.99% even though Icahn-controlled entities only owned 69.8% of the outstanding Partnership common units.[98] The delta

[95] Compl. ¶ 118.

[96] 17 C.F.R. § 240.3b-7; *see In re Good Tech. Corp. S'holder Litig.*, 2018 WL 3649449, at *2 (Del. Ch. July 31, 2018) ("[W]hen sophisticated parties in corporate litigation use ["affiliate" and "associate"], they base their understanding on the widely used definitions adopted by the federal securities laws.").

[97] Defs.' Opening Br. at 38 (emphasis supplied by the defendants) (citing P'ship Agreement § 1.1).

[98] Compl. ¶ 49 (emphasis added).

was owned by "directors and executive officers of the General Partner," including DeVelasco.[99]

Events related to this litigation further support the conclusion that DeVelasco could be considered an Affiliate. Two days after the first complaint challenging the Call Right Exercise was filed, DeVelasco filed an SEC Form 4 to clarify that the units she purchased were held by a trust for which she serves as a co-trustee. Notwithstanding the defendants' claims that they were correcting an erroneous SEC filing, it is reasonable to infer from the defendants' conduct that they were aware that DeVelasco could be considered an Affiliate and that her purchase would trip Section 15.1(a).

The defendants also argue that DeVelasco is not truly the owner of the units at issue, but this fallback position turns on a factual dispute. The plaintiffs adequately plead that DeVelasco "purchased through a dividend reinvestment 236.2019 units of the Partnership" on November 14, 2018.

In the end, it might be that the definition of "Affiliate" in the Partnership Agreement sufficiently differs from the other definitions to warrant excluding DeVelasco. It could also be that DeVelasco did not purchase or own the units. But for the purpose of this motion, it is reasonably conceivable that DeVelasco was an Affiliate and purchased the units.

---

[99] *Id.*

Accordingly, the plaintiffs have stated a claim against the General Partner for breaching its contractual obligations to set the exercise price of the Call Right. By this time, CVR Energy was a party to the Partnership Agreement, and thus the plaintiffs have also stated a claim against CVR Energy for breach of the Partnership Agreement.

This aspect of Count I does not state a claim against the Partnership because the General Partner did not cause the Partnership to take any action in connection with the Call Right. Nor does this aspect of Count I state a claim against CVR Holdings, which is not the subject of a single allegation in the Complaint.[100]

## B. Breach of the Implied Covenant

In Count II, the plaintiffs claim that the Partnership, the General Partner, CVR Holdings, and CVR Energy breached the implied covenant of good faith and fair dealing by undermining the price-setting mechanisms contained in the Call Right.[101] The plaintiffs have stated a claim upon which relief can be granted.

In *Dieckman*, the Delaware Supreme Court articulated the principles governing the application of the implied covenant in the MLP context as follows:

> The implied covenant is inherent in all contracts and is used to infer contract terms "to handle developments or contractual gaps that the asserting party pleads neither party anticipated." It applies "when the party asserting the implied covenant proves that the other party has acted

---

[100] *See supra* note 89 and accompanying text.

[101] Pls.' Answering Br. at 41–46.

arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected." The reasonable expectations of the contracting parties are assessed at the time of contracting. In a situation like this, involving a publicly traded MLP, the pleading-stage inquiry focuses on whether, based on a reading of the terms of the partnership agreement and considerations of the relationship it creates between MLPs investors and managers, the express terms of the agreement can be reasonably read to imply certain other conditions, or leave a gap, that would prescribe certain conduct, because it is necessary to vindicate the apparent intentions and reasonable expectations of the parties.[102]

The implied covenant is a limited remedy[103] whose application is a "cautious enterprise."[104] Plaintiffs cannot "re-introduce fiduciary review through the backdoor of the implied covenant."[105] Nor can they seek to "rebalanc[e] economic interests after events that could have been anticipated but were not, that later adversely affected one party to a contract."[106] "[T]he implied covenant 'does not apply when the contract addresses the conduct at issue,' but only 'when the contract is truly

---

[102] *Dieckman,* 155 A.3d at 367 (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1125, 1126 (Del. 2010)).

[103] *Oxbow Carbon & Minerals Hldgs. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 507 (Del. 2010) (quoting *Nemec*, 991 A.2d at 1128).

[104] *Nemec*, 991 A.2d at 1125.

[105] *Lonergan v. EPE Hldgs., LLC*, 5 A.3d 1008, 1019 (Del. Ch. 2010).

[106] *Boardwalk*, 2019 WL 4927053, at *22 (citing *Nemec*, 991 A.2d at 1128); *see also Winshall v. Viacom Int'l, Inc.*, 55 A.3d 629, 636–37 (Del. Ch. 2011), *aff'd*, 76 A.3d 808 (Del. 2013) (The implied covenant "should not be applied to give plaintiffs contractual protections that 'they failed to secure for themselves at the bargaining table.'" (quoting *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1260 (Del. 2004))).

silent' concerning the matter at hand."[107] "Even where the contract is silent, '[a]n interpreting court cannot use an implied covenant to re-write the agreement between the parties'"[108] because "express contractual provisions 'always supersede' the implied covenant."[109]

*Dieckman* is particularly instructive. In that case, two limited partnerships in the same MLP family sought to merge in a conflicted transaction.[110] The limited partnership agreement afforded the general partner a safe harbor for conflicted transactions if the transaction was approved by a fully independent special committee or by a majority vote of unaffiliated unitholders.[111] To obtain the latter protection, the general partner distributed a proxy statement describing at length the planned merger, even though the express terms of the partnership agreement required a disclosure of only a summary of the merger agreement.[112] The lengthy proxy statement did not disclose, however, that one member of the two-member

---

[107] *Oxbow*, 202 A.3d at 507 (first quoting *Nationwide Emerging Managers, LLC v. Northpointe Hldgs. LLC*, 112 A.3d 878, 896 (Del. 2015); then quoting *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1033 (Del. Ch. 2006)).

[108] *Oxbow*, 202 A.3d at 507 (quoting *Nationwide*, 112 A.3d at 896).

[109] *Boardwalk*, 2019 WL 4927053, at *22 (citing *Gerber v. Enter. Prods. Hldgs.*, 67 A.3d 400, 419 (Del. 2013)).

[110] *Dieckman*, 155 A.3d at 360.

[111] *Id.*

[112] *Id.* at 365.

special committee had "alleged overlapping and shifting allegiances" that might have called into question his independence.[113]

The plaintiffs challenged the transaction, claiming in part that the general partner "failed to satisfy the [u]naffiliated [u]nitholder [a]pproval safe harbor because the general partner made false and misleading statements in the proxy statement to secure that approval."[114] The defendants moved to dismiss the complaint, claiming that "in the absence of express contractual obligations not to mislead investors or to unfairly manipulate the . . . process, the general partner need only satisfy what the partnership agreement expressly required."[115] Put differently, the defendants argued that "only the express requirements of the partnership agreement controlled and displaced any implied obligations not to undermine the protections afforded unitholders by the safe harbors."[116]

At the trial level, the Court of Chancery granted the motion to dismiss based on the safe harbor.[117] The Court "held that, even though the proxy statement might have contained materially misleading disclosures, fiduciary duty principles could not be used to imply disclosure obligations on the general partner beyond those in

---

[113] *Id.* at 366.

[114] *Id.* at 360.

[115] *Id.*

[116] *Id.*

[117] *Id.* at 361.

the partnership agreement, because the partnership agreement disclaimed fiduciary duties."[118] The Court concluded that the general partner had complied with an express provision in the partnership agreement, which required the general partner to provide only a summary of the merger agreement.[119] The Court explained that this express provision foreclosed any implied contractual duty to disclose material facts about the process.[120]

On appeal, the Delaware Supreme Court reversed. The Court reasoned that although the implied covenant cannot supplant express contractual provisions, the trial court "focused too narrowly on the partnership agreement's disclosure requirements."[121] The Supreme Court instead trained its sights on the safe harbor provision, which encouraged the general partner to establish procedural mechanisms designed to protect the minority unitholders in the event of a conflicted transaction:

> We find that implied in the language of the LP Agreement's conflict resolution provision is a requirement that the General Partner not act to undermine the protections afforded unitholders in the safe harbor process. Partnership agreement drafters, whether drafting on their own, or sitting across the table in a competitive negotiation, do not include obvious and provocative conditions in an agreement like "the General Partner will not mislead unitholders when seeking Unaffiliated Unitholder Approval" or "the General Partner will not

---

[118] *Id.*

[119] *Id.*

[120] *Id.*

[121] *Id.*

subvert the Special Approval process by appointing conflicted members to the Conflicts Committee." But the terms are easily implied because "the parties must have intended them and have only failed to express them because they are too obvious to need expression." Stated another way, "some aspects of the deal are so obvious to the participants that they never think, or see no need, to address them."[122]

The *Boardwalk* decision relied on *Dieckman* to deny a motion to dismiss a similar implied covenant claim. After reviewing contractual price protections similar to those at issue in this case, the Vice Chancellor held that "it is reasonable to infer at the pleading stage that the parties had a reasonable expectation that the General Partner would notify unitholders about its exercise of the Call Right in a manner that would not affect the call price."[123] In that case, as here, the general partner disclosed that it was "seriously considering" exercising the call right.[124] In response to that disclosure, which the Vice Chancellor dubbed the "Potential-Exercise Disclosure," Boardwalk's unit price traded down during the trading

---

[122] *Id.* at 368 (first quoting *Danby v. Osteopathic Hospital Ass'n of Del.*, 101 A.2d 308, 313–14 (Del. Ch. 1953), *aff'd*, 104 A.2d 903 (Del. 1954); and then quoting *In re El Paso Pipeline P'rs, L.P. Deriv. Litig.*, 2014 WL 2768782, at *16 (Del. Ch. June 12, 2014), *rev'd on other grounds sub nom. El Paso Pipeline GP Co. v. Brinckerhoff*, 152 A.3d 1248 (Del. 2016)); *see also id.* (holding that "[t]he implied covenant is well-suited to imply contractual terms that are so obvious—like a requirement that the general partner not engage in misleading or deceptive conduct to obtain safe harbor approvals—that the drafter would not have needed to include the conditions as express terms in the agreement").

[123] *Boardwalk*, 2019 WL 4927053, at *23.

[124] *Id.*; *see* Compl. ¶ 5.

window relravant to the price-protection mechanism.[125]   The Vice Chancellor concluded that this sequence of events "support[ed] a reasonable inference that the defendants manufactured a basis to make the Potential-Exercise Disclosure because they believed doing so would drive down the call price."[126]

*Dieckman* leads to the same result in this action.  In *Dieckman*, the Supreme Court focused on the reasonable meaning of the safe harbor protections.  In this case, the plaintiffs focus on the reasonable meaning of contractual provisions designed to protect minority unitholders—the 90-day Provision and the 20-day Formula.[127]  The 90-day Provision prevents minority unitholders from having their units called at a price below what the General Partner or its Affiliates paid to purchase any units within the 90 days preceding the exercise date.[128]  The 20-day Formula calls for the price to be "the average of the daily Closing Prices per Partnership Interest of such class for the 20 consecutive Trading Days immediately prior to such date," which

---

[125] *Boardwalk*, 2019 WL 4927053, at *5.

[126] *Id.* at *23.

[127] *See Dieckman*, 155 A.3d at 367 (focusing the implied covenant analysis on the safe harbor provision and "what its terms reasonably mean").

[128] P'ship Agreement § 15.1(a) ("the greater of (x) . . . or (y) the highest price paid by the General Partner or any of its Affiliates for any such Limited Partner Interest of such class purchased during the 90-day period preceding the date [of the mailing of the Notice of Election to Purchase].").

appears designed to ensure the exercise of the Call Right at a price unaffected by the public announcement of the exercise.[129]

In *Dieckman*, the Supreme Court held that it is reasonably conceivable that "implied in the language of the LP Agreement's conflict resolution provision is a requirement that the General Partner not act to undermine the protections afforded unitholders in the safe harbor process."[130] In this case, it is reasonably conceivable that implied in the language of the Call Right provision is a requirement that the defendants not act to undermine the protections afforded to unitholders by the price-protection mechanisms. Just as it would be "obvious" and "provocative" to demand the inclusion of an express condition that a general partner not subvert a safe harbor protection through materially misleading disclosures, it would be "obvious" and "provocative" to demand the inclusion of an express condition that a general partner and its affiliates not subvert price-protection mechanisms through a multi-step scheme designed to manipulate the unit price.[131]

In *Dieckman*, the Supreme Court held that the plaintiffs alleged facts to show that it was reasonably conceivable that certain of the defendants breached the implied covenant.[132] In this case, the plaintiffs have likewise alleged facts to show

---

[129] *Id.*; *id.* § 1.1 (definition of "Current Market Price").

[130] *Dieckman*, 155 A.3d at 360.

[131] *Id.* at 368.

[132] *Id.* at 369.

41

that it was reasonably conceivable that certain of the defendants breached the implied covenant.

In their primary response to these points, the defendants argue that because CVR Energy made the allegedly manipulative disclosures, and because CVR Energy was not a party to the Partnership Agreement at the time, *Dieckman* and *Boardwalk* are distinguishable. This argument would require the Court to reject the reasonable inference that the defendants carried out the related steps of the transaction as a coordinated scheme.

To the contrary, it is reasonably conceivable that the General Partner worked with CVR Energy to frustrate the Call Right's price-protection mechanisms. Each Board member had strong ties to Icahn and Icahn Enterprises, the ultimate controller of CVR Energy.[133] Half of the Board also served of the board of CVR Energy. One Board member was CVR Energy's CEO; others were dependent on different Icahn entities for employment. Given their status within the industry, it is reasonably conceivable that the Board followed analyst coverage of the Boardwalk call right in real time. The first meeting to consider the Exchange Offer occurred only two days after JP Morgan's report on the Boardwalk process. The Board's significant ties to CVR Energy and Icahn generally, their knowledge of the events at Boardwalk, and the temporal proximity of the relevant events, together give rise to a reasonably

---

[133] Icahn Enterprises, L.P. actually controls CVR Energy through its 82% ownership stake.

conceivable inference that the General Partner worked with CVR Energy to frustrate the Call Right's price protections.

The defendants further argue that they did not breach the implied covenant because "CVR Energy *may well have been* legally required to issue the updated discovery in November 2018."[134] The defendants stop short of arguing that CVR Energy was in fact legally required to disclose that it was "considering" exercising the Call Right, and thus their argument lacks any real heft at the pleadings stage. At this stage, it is reasonable to infer the defendants *may not have been* legally required to issue the disclosure, and that the disclosure's sole purpose was to drive down the trading price of the common units in advance of exercising the Call Right.

Notwithstanding this analysis, some defendants named in Count II are not bound by the implied covenant. CVR Energy was not bound by the terms of the Partnership Agreement at any point in time covered by the plaintiffs' allegations. Thus, CVR Energy is dismissed from Count II. CVR Holdings is also dismissed from Count II because there are no facts pled specific to its role in the scheme.[135] The motion to dismiss Count II is denied as to the Partnership for the same reasons discussed in connection with the Count I Exchange Offer claim.[136]

---

[134] Defs.' Opening Br. at 47 (emphasis added, original emphasis omitted).

[135] *See supra* note 89 and accompanying text.

[136] *See supra* note 88 and accompanying text.

43

## C. Tortious Interference with Contract

In Count III, the plaintiffs claim that CVR Energy, Icahn Enterprises, and the Individual Defendants tortiously interfered with the Partnership Agreement. Such a claim requires (1) a contract, (2) about which the particular defendant knew, (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, and (5) which causes injury.[137] A defendant can be liable for tortious interference if there is an underlying breach of an express or implied contractual obligation.[138]

The defendants do not directly dispute that the plaintiffs have adequately pled each of the five elements. Instead, they assert that there was no underlying breach.[139] They alternatively rely on the "stranger rule," which says that only strangers to a contract can tortiously interfere with that contract.[140] Having found it reasonably conceivable that certain defendants breached the express and implied terms of the Partnership Agreement, the Court focuses on the "stranger rule."

---

[137] *WaveDivision Hldgs., LLC v. Highland Capital Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012) (citing Restatement (Second) of Torts § 766 (1979)).

[138] *See NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at *25 (Del. Ch. Nov. 17, 2014).

[139] Defs.' Opening Br. at 50–51; Defs.' Reply Br. at 29–30; Defs.' Supp. Br. at 8.

[140] Defs. Opening Br. at 51–53; Defs.' Reply Br. at 29–30.

*Boardwalk* is again instructive. That decision identified doctrinal dissonance between the stranger rule as applied a handful of times by this Court,[141] on the one hand, and the Restatement's multi-factor standard adopted by the Delaware Supreme Court, on the other hand.[142]

As *Boardwalk* explained, the stranger rule was originally imported into Delaware law in 2007 from jurisdictions that have adopted an "absolute affiliate" privilege.[143] That privilege flows from the premise that "a parent and its wholly owned subsidiaries constitute a single economic unit" such that "'interference' from a parent in the performance of contractual obligations of its wholly owned subsidiary, no matter how aggressive, is not actionable."[144] Wherever possible, Delaware law tends to steer clear of bright line rules like this, which ignore the corporate form.[145]

---

[141] *See Boardwalk*, 2019 WL 4927053, at *27 n.14 (collecting Court of Chancery cases in which the stranger rule has been applied or cited).

[142] *WaveDivision*, 49 A.3d at 1174; *ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749, 751 (Del. 2010).

[143] *Boardwalk*, 2019 WL 4927053, at *27 (identifying *Tenneco Auto., Inc. v. El Paso Corp.*, 2007 WL 92621, at *5 (Del. Ch. Jan. 8, 2007), as the original adopter of the stranger rule, and explaining that the germ came from a Georgia decision, *Atlanta Mkt. Ctr. Mgmt., Co. v. McLane*, 503 S.E.2d 278, 283–84 (Ga. 1998)).

[144] *Id.* at *27–28 (quoting *Shearin v. E.F. Hutton Gp.*, 652 A.2d 578, 590 (Del. Ch. 1994)).

[145] *See, e.g.*, *Pauley Petroleum, Inc. v. Cont'l Oil Co.*, 231 A.2d 450, 452–54 (Del. Ch. 1967), *aff'd*, 239 A.2d 629 (Del. 1968); *Shearin*, 652 A.2d at 590 n.13 (citing *Pauley* and concluding that the limited privilege theory "is more consistent with the traditional respect accorded to the corporate form by Delaware law").

In fact, when considering the appropriate standard for a claim of tortious interference, the Delaware Supreme Court adopted the Restatement's more nuanced, "limited privilege" approach.[146]  The Restatement recognizes that parties can take action that technically interferes with the contracts of others if done in the spirit of genuine economic competition, and the relevant inquiry is therefore whether the interference was "improper" or unjustified.[147]  Toward that end, the Restatement establishes a multi-factored balancing test,[148] which considers the "relations between the parties"[149] and "'the significant economic interests of a parent corporation in its subsidiary,' but does so without foreclosing potential liability on the sole basis of related-party status."[150]

Because the bright-line "absolute privilege" of the stranger rule threatens the nuanced "limited privilege" approach endorsed by the Delaware Supreme Court, the Court in *Boardwalk* concluded that "[i]t would be inconsistent . . . to layer on the

---

[146] *WaveDivision*, 49 A.3d at 1174; *ASDI*, 11 A.3d at 751 (Del. 2010).

[147] *Shearin*, 652 A.2d at 589.

[148] *WaveDivision*, 49 A.3d at 1174 (identifying the Restatement factors as "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties" (citing Restatement (Second) of Torts § 767)).

[149] *Id.* (identifying "the relations between the parties" as factor "(g)").

[150] *Boardwalk*, 2019 WL 4927053, at *28.

46

stranger rule as an additional element of the analysis."[151]   That well-reasoned

conclusion compels the Court to reject CVR Energy and Icahn Enterprises' stranger-

rule defense.   Further, under the Restatement, justification is a "fact-specific

inquiry,"[152] and the defendants have not offered arguments for why any alleged

interference was justified in this case.

To be sure, *Boardwalk*'s discussion of the stranger rule only addressed entity

defendants, and the plaintiffs bring Count III against the Individual Defendants as

well.   In *Shearin*, a case heavily relied upon in *Boardwalk*, Chancellor Allen left

untouched the reasoning that "'employees . . . of a contracting corporation cannot be

held personally liable for inducing a breach of contract by their corporations when

they act within their given role.'"[153]   This is because "Delaware law adheres to this

general rule of imputation—of holding a corporation liable for the acts and

knowledge of its agents—even when the agent acts fraudulently or causes injury to

third persons through illegal conduct."[154]

There are exceptions to this general rule of imputation, including "when the

corporate agent responsible for the wrongdoing was acting solely to advance his own

---

[151] *Id.*

[152] *Id.* at *29.

[153] *OptimisCorp v. Waite*, 2015 WL 5147038, at *76 n.602 (Del. Ch. Aug. 26, 2015) (citing *Shearin*, 652 A.2d at 590), *aff'd*, 137 A.3d 970 (Del. 2016).

[154] *Stewart v. Wilm. Tr. SP Servs., Inc.*, 112 A.3d 271, 303 (Del. Ch. 2015), *aff'd*, 126 A.3d 1115 (Del. 2015).

personal financial interest, rather than that of the corporation itself."[155] "Because most instances of fraud or illegal misconduct by corporate actors confer at least some benefit on the corporation, the adverse interest exception may not apply even when the 'benefit' enjoyed by the corporation is outweighed by the long-term damage that is done when the agent's mischief comes to light."[156] "Stated differently, 'an officer or director may be held personally liable for tortious interference with a contract of the corporation if, and only if, said director exceeds the scope of his agency in doing so.'"[157]

The plaintiffs have not alleged that the Individual Defendants exceeded the scope of their agency in this case. The plaintiffs argue that the directors "signed fraudulent securities filings . . . , chose not to seek financial advice or to negotiate the terms of the partial exchange offer," and made various public, allegedly misleading announcements regarding the Call Right.[158] All of these acts are within the purview of the directors of an entity and cannot serve as the basis for an argument that the Board "exceeded the scope of its agency." Thus, Count III is dismissed as

---

[155] *In re Am. Int'l Gp., Inc., Consol. Deriv. Litig.*, 976 A.2d 872, 891 (Del. Ch. 2009), *aff'd sub nom. Teachers' Ret. Sys. of La. v. Gen. Re Corp.*, 11 A.3d 228 (Del. 2010).

[156] *Stewart*, 112 A.3d at 303.

[157] *OptimisCorp*, 2015 WL 5147038, at *76 n.602 (citing *Int'l Ass'n of Heat & Frost Insulators & Asbestos Workers Local Union 42 v. Absolute Envtl. Servs., Inc.*, 814 F. Supp. 392, 400 (D. Del. 1993)).

[158] Pls.' Answering Br. at 48–49.

to the directors. However, Icahn served as a director only through the day before the Exchange Offer closed in July 2018. The plaintiffs' allegations that Icahn used his control over the Partnership and General Partner to cause those entities to breach the express and implied provisions of the Partnership Agreement stretch beyond July 2018. Thus, the motion to dismiss Count III is denied as to Icahn.

## III. CONCLUSION

The defendants' motion to dismiss is GRANTED in part and DENIED in part. The Count I Exchange Offer claim is dismissed as to CVR Energy and CVR Holdings. The Count I Exercise Price claim is dismissed as to the Partnership and CVR Holdings. Count II is dismissed as to CVR Energy and CVR Holdings. Count III is dismissed as to each of the Individual Defendants except Icahn. In all other respects, the motion to dismiss is denied.